**TRANSPAC DRILLING VENTURE**
**1982–12, et al., Petitioners,**

**Guy J. Cutili, et al., Petitioners–**
**Appellants,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent–**
**Appellee.**

Docket Nos. 95–4177(L), 95–4179, 95–4183, 95–4185, 95–4187, 95–4193, 95–4195, 95–4197, 95–4199, 95–4203, 97–4213 and 97–4219(CON).

United States Court of Appeals,
Second Circuit.

Argued April 22, 1998.
Decided June 26, 1998.

Richard J. Sapinski, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Newark, NJ (Charles W. Haydon, Mortimer Lipsky, and Bernard Kobroff, of counsel), for Petitioners–Appellants.

Pamela C. Berry, Tax Division, United States Department of Justice, Washington, DC, for Loretta C. Argrett, Assistant Attorney General (Richard Farber, of counsel), for Respondent–Appellee.

Before: WALKER and CALABRESI, Circuit Judges, and RESTANI,* Judge.

CALABRESI, Circuit Judge:

The specific question we address in this appeal is whether, as a result of being placed under criminal investigation by the IRS (and hence becoming subject to pressure by the IRS), the tax matters partners (TMPs) of various partnerships labored under a conflict of interest and thereby were disqualified from binding the partnerships. The Tax Court held that they had not lost their authority. We disagree and reverse.

---

* The Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

## I.

Seventy-one partnerships (the "Transpac partnerships"), each containing 30–50 limited partners, were promoted, primarily, by John Galanis, a convicted tax felon. Although these partnerships were ostensibly formed to explore oil and gas ventures, the government has alleged that the function of the Transpac partnerships was to serve as illegitimate tax shelters for their limited partners, who, as a result, were able to avail themselves of generous tax losses. Supposedly assisting Galanis in his scheme were at least three individuals who figure prominently in this appeal: John Volatile, Morris Cofman, and Douglas C. Adams. These three, and/or their corporate alter egos, served (at least at some time) either as sole general partners or as co-general partners of the numerous Transpac partnerships that are the petitioners in this litigation.

Since the taxation of partnerships is generally conducted at the individual level, the income and expenses of the partnership normally "flow through" to the several partners, who remain ultimately responsible for filing their own taxes. In 1982, however, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), which, among other things, centralizes the treatment of many partnership taxation issues. *See* Pub.L. No. 97–248, § 402(a), 96 Stat. 324 (codified as amended at 26 U.S.C. §§ 6221–23). Under TEFRA, when the IRS wishes to deal with questions that affect the entire partnership, it may consult an entity called the "tax matters partner" (TMP), who has the authority to serve as the partnership's representative to the IRS and, in some matters, to bind the limited partners by its actions. *See, e.g., id.* § 6224(c)(3)(A).[1] Volatile, Cofman, and Adams (and their various corporate alter egos) served as TMPs for the petitioning partnerships.

In the latter part of 1983, the IRS began a series of civil audits of the Transpac partnerships. By 1985, apparently in conjunction with information gleaned from an FBI bank fraud investigation, the IRS became aware that Galanis was involved with these partnerships. On November 7, 1985, the Transpac audits were sent to the IRS's criminal investigation unit, which "accepted" the referral in December. By January of 1986, Galanis had informed Volatile, Cofman, and Adams that the audits were "not going well," and that he had arranged for legal representation.

On February 5, 1986, Volatile and Cofman were served with subpoenas calling them to appear and to produce documents before a grand jury.[2] The grand jury focused its investigation on Galanis and Adams; Volatile and Cofman appear to have been left in limbo—under criminal investigation, but not yet official targets of grand jury proceedings—until around May of 1986.

During the spring of 1986, as the various criminal investigation efforts continued, several meetings between Volatile, the IRS, and the FBI took place. And on May 7, 1986, Volatile formally agreed to become a co-operating witness in the Galanis investigation. Cofman also agreed to co-operate. As a result, both were granted immunity from prosecution. Adams, by contrast, remained the subject of grand jury indictment proceedings. But at some point in May 1987, he too agreed to co-operate with the government pursuant to a plea bargain (that resulted in a suspended sentence). In 1988, Galanis went to trial and, in part due to the participation of the three co-operating witnesses, was convicted.

---

1. Under 26 U.S.C. § 6231(a)(7)(A), the TMP is the general partner so designated by the partnership under applicable regulations. If no such partner is designated, the TMP is (ordinarily) the general partner with the largest profit stake in the partnership. *See id.* at § 6231(a)(7)(B). In addition, if the Secretary [of the Treasury] cannot practicably determine which partner has the largest profit interest, he has the authority to designate the TMP for the partnership. *See id.* at § 6231(a)(7).

2. According to IRS protocol, the criminal investigation was at this point converted into a grand jury investigation, and authority was turned over to the United States Attorney's Office. While the record is not clear, it appears that the civil audits were initiated by the Providence, Rhode Island branch office of the IRS, but the grand jury proceedings were run by the United States Attorney for the Southern District of New York.

While the foregoing criminal investigation was proceeding and escalating, the Service pursued its civil audits of the Transpac partnerships with respect to the 1982, 1983, and 1984 tax years. The statute of limitations to file Final Partnership Administrative Adjustments (FPAAs) is generally three years.[3] *See* 26 U.S.C § 6229(a)(2). And so, as early as November 1985, the statute was about to run on the first tax year in question, 1982. Under TEFRA, however, the Commissioner may receive an extension if he secures the permission of the partner whose return would be affected. *See id.* § 6229( b)(1)(A). If the extension applies to the return of the whole partnership (*i.e.,* if the extension affects all of the limited partners) then the Commissioner—unless he is willing to seek the consent of *every* partner—must get the approval from the partnership's TMP. *See id.* § 6229(b)(1)(B).

In the instant case, the Service originally (in November of 1985) sought extensions from the individual partners. Most of those who were contacted declined the IRS' requests. Having been rebuffed by the *limited partners,* the IRS, in February 1986, began to contact the *TMPs*—who by this point were under criminal scrutiny—and asked them to approve extensions on the three-year statute of limitations. Not surprisingly, this solicitation was received more warmly: Volatile, Cofman, and Adams, and/or their corporate analogues and their duly authorized attorneys, all executed the extensions sought by the Service. Extension requests continued to be sought and given through March 1988 (since the last of the tax years in question was 1985). As the government did not file the FPAAs until November 1989, the FPAAs would have been untimely, but for the extensions.

Various limited partners duly objected to the FPAAs and requested the appropriate administrative and judicial review. (Ordinarily, objections to FPAAs are filed by the

TMP. *See id.* § 6228(a)(1).) Eventually, in 1990, the Tax Court, under Tax Court Rule 250, removed the TMPs and named several limited partners to that status. *See* Tax Ct. Rule 250 (allowing the Tax Court to fill vacancies or remove and replace disqualified TMPs).

In the ensuing civil litigation, some of the limited partners argued that the extensions granted by the TMPs were invalid because a conflict of interest existed by virtue of the TMPs' status, first as targets and finally as co-operating participants, in the criminal proceedings regarding the Transpac partnerships. For expeditious resolution of this legal question, the parties agreed to consolidate their actions and to address the single question of whether, under the circumstances of these events, the TMPs were permitted to bind the partnerships to the extensions. The Tax Court (Clapp, *Judge* ), ruled against petitioners. *See Transpac Drilling Venture 1982–16 v. Commissioner,* 67 T.C.M. (CCH) 19995 (1994). This appeal followed.[4]

## II.

■ This case turns on whether the TMPs had authority to bind the partnerships, so that the extensions the TMPs signed were valid. Specifically, the petitioners claim that the circumstances surrounding the criminal investigation of the TMPs—viewed in the light of the fact that the TMPs subsequently became co-operating government witnesses in grand jury proceedings—created a conflict of interest that precluded the faithful exercise of the TMPs' fiduciary duties to the limited partners and the partnerships. Accordingly, petitioners contend that the statute-of-limitations extensions signed by the TMPs are invalid. Respondent never really meets this argument head on, but insists, for a variety of reasons, that the extensions had to have been valid.[5] None of the Commissioner's arguments has merit.

---

3. In cases involving tax fraud, the statute of limitations becomes six years. *See* 26 U.S.C. § 6229(c)(1)-(2). The application of this alternative statute of limitations is an argument that the Commissioner has explicitly preserved for remand (should he not prevail on this appeal).

4. Related Transpac proceedings were resolved in the Federal Circuit, which, deeming the six-year statute of limitations to apply, declined to reach the issue in this appeal. *See Transpac Drilling Venture, 1983–2 v. United States,* 83 F.3d 1410, 1413–14 (Fed.Cir.1996).

5. Although reliance on a statute of limitations is

## A.

■ First, the respondent suggests that the TMPs, as "creatures of statute," exist solely at the pleasure of the Secretary and owe no fiduciary duty to the limited partners. This position is contrary to settled law. *See Computer Programs Lambda, Ltd. v. Commissioner*, 89 T.C. 198, 205, 1987 WL 42563 (1987) ("*Lambda I* ").[6] By centralizing tax-related proceedings of the partnership in one person or entity, Congress created a statutory analogue of the class representative in class action proceedings. And just as class members, though entitled to due process safeguards, can be bound by the results of a proceeding to which they are non-parties because the class representatives owe them fiduciary duties, *see, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), so the limited partners secure their due process protection as a result of the fact that the TMP stands in a fiduciary relationship toward them. We conclude that the TMP's duty to the individual limited partners and to the partnerships in general is beyond question.

The second argument advanced by the Commissioner is that any conflict of interest is, in this case, harmless, because a fully competent fiduciary would most likely have executed the extensions sought by the IRS. The assertion is frivolous. Even assuming, *arguendo*, that the government's proposition

might be true in some cases, it is manifestly false in this appeal. The limited partners, when solicited individually, consistently rejected the government's extension requests. Under the circumstances, we are hard pressed to conceive of a reasonable basis for the government's argument.[7]

■ Third, respondent advances an alternative "harmless error" theory: that the granting or denial of an extension was irrelevant, because, had the extensions been denied, the Service would most likely have filed the FPAAs within the three-year time period. But as petitioners point out, the IRS has existing policies that expressly mention situations in which the Service may intentionally let the statutes of limitations run. Among these are cases in which bringing a timely civil claim may jeopardize important criminal prosecutions. *See, e.g.,* Internal Revenue Manual § 9325.2(4)(b) (1998). We cannot say, on the facts before us that it would be "illogical" for the Service to have let the statute run. Accordingly, we reject the Commissioner's argument of hypothetical diligence.

## B.

The final argument advanced by the respondent provided the basis for the Tax Court's opinion below and is somewhat more complicated. It seeks to ground itself on

---

generally an affirmative defense, we believe that petitioners' prima facie showing that the three-year limit had run properly shifted the burden to the respondent to invoke one of the exceptions, such as a duly executed extension.

6. *Lambda I* explained in more detail:
   The tax matters partner's status is of critical importance to the proper functioning of the partnership audit and litigation procedures, and the statute recognizes this status....
   The tax matters partner is the central figure of partnership proceedings.... Moreover, the tax matters partner may, under some circumstances, bind partners who are not notice partners by entering into a settlement agreement with respondent.
   In the execution of these responsibilities a tax matters partner acts as a fiduciary. His personal interest, if any, is beside the point....
   The detailed statutory procedures for partnership level audits and litigation contemplate the continual presence of one tax matters partner, and the procedures cannot operate unless the

tax matters partner is capable of acting on the partnership's behalf regardless of his personal tax posture. As the fiduciary of the partnership's interest in the proceeding, the tax matters partner's initiative (or failure to take initiative) is plainly designed to affect the rights of all partners in the partnership.
*Lambda I*, 89 T.C. at 205–06 (citations omitted). The Commissioner's attempt to restrict the principles of *Lambda I* to cases in which the TMP is involved in bankruptcy misses the broader significance of this passage.

7. In view of our holding, we need not address the issue of whether a "structural" concern with a fiduciary's decisionmaking process, such as a conflict of interest, should be subjected to a harmless error analysis at all. *See* Restatement (Second) of Agency § 389 cmts. a, c (agent's conflict of interest renders transaction voidable at option of principal, regardless of resulting harm).

Temporary Treasury Regulation § 301.6231(c)–5T ("Criminal Investigations Regulation"), which was enacted pursuant to TEFRA, *see* 26 U.S.C. § 6231(c)(3) ("Special Enforcement Provision").

The Special Enforcement Provision states: *Regulations with respect to certain special enforcement areas.—*

(1) *Application of Subsection.*—This subsection applies in the case of—.

(A) assessments under section 6851 . . . ,

(B) criminal investigations,

(C) indirect methods of proof of income,

(D) foreign partnerships, and

(E) other areas that the Secretary determines by regulation to present special enforcement considerations.

(2) *Items may be treated as nonpartnership items.*—To the extent that the Secretary determines and provides by regulations that to treat items as partnership items will interfere with *the effective and efficient enforcement of this title* in any case described in paragraph (1), such items shall be treated as nonpartnership items for purposes of this subchapter.

(3) *Special Rules.*—The Secretary may prescribe by regulation such special rules as the Secretary determines to be necessary *to achieve the purposes of this subchapter* in any case described in paragraph (1).

26 U.S.C. § 6231 (emphasis added).

Under this Special Enforcement Provision, the Secretary enacted, *inter alia*, the Criminal Investigations Regulation, which provides:

Criminal investigations (Temporary).

The treatment of items as partnership items with respect to a partner under criminal investigation for the violation of the internal revenue laws relating to income tax will interfere with *the effective and efficient enforcement of the internal revenue laws*. Accordingly, partnership items of such a partner arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner to which the criminal investigation relates shall be treated as nonpartnership items as of the date of which the partner is notified that he or she is the subject of criminal investigation *and receives written notification from the Service* that his or her partnership items shall be treated as nonpartnership items. The partnership items of a partner who is notified that he or she is the subject of a criminal investigation shall not be treated as nonpartnership items under this section *unless and until such partner receives written notification from the Service of such treatment.*

Temp. Treas. Reg. § 301.6231(c)–5T (emphasis added).

The foregoing regulation can apply to any partner, and the Secretary has specifically decided that it can be applied with respect to the TMP of a partnership. See Temp. Treas. Reg. § 301.6231(a)(7)–1T(*l*)(1) ("A designation of a tax matters partner for a taxable year under this section shall remain in effect until—. . . . (iv) the partnership items of the tax matters partner become nonpartnership items under section 6231(c) (relating to special enforcement areas).").

Having promulgated the above-mentioned regulation, the Commissioner advances the following argument: (1) Section 6231 (The Special Enforcement Provision) was concerned primarily with the effective and efficient administration of TEFRA by the Secretary; (2) the Criminal Investigations Regulation is a reasonable agency interpretation of that statute; (3) the Service declined to exercise its authority under the Criminal Investigations Regulation to remove the TMPs of the petitioning partnerships; and therefore (4) the operation of the criminal investigation did not end the authority of the TMPs to bind the partnerships. In other words, because the IRS decided that the criminal investigations did not abrogate the TMPs' authority—as evidenced by its decision not to issue a § 301.6231(c)–5T letter—agency deference requires us to abide by the Service's decision.

■ Respondent's argument is flawed. The Special Enforcement Provision of TEFRA is concerned with efficient administration of the tax law. Accordingly, it requires the Secretary to promulgate regulations that serve that interest. As such, it properly forms the basis for regulations permitting the removal of a TMP when to do so furthers the government's interest. But these regulations are not (and, indeed, cannot) be the exclusive ground for removing a TMP following the commencement of a criminal investigation. If they were, then the only way in which a criminal investigation could be the predicate for the removal of a TMP would be if the IRS decided (by issuing a letter) to oust the TMP. And this would be so even when it would be in the Service's strong interest to capitalize on a possible conflict of interest by keeping the TMP in place. We cannot lightly impute to Congress the intent to vest *sole* discretion to determine the existence of a conflict of interest in the very party that, by its actions (albeit justified), causes the conflict. And there is nothing in the language or history of TEFRA that would lead us to do so.

We therefore conclude that where serious conflicts exist, a TMP may be barred from acting on behalf of the partnership, quite apart from the issuance of a government letter under current Regulation 301.6231(c)–5T. Accordingly, we now turn to the core of petitioners' appeal: that the TMPs had a conflict of interest which made their consents to extensions of the limitations periods void. Without much pause, we hold that they did.

### C.

■ The facts of the matter speak for themselves. The IRS had transformed the civil audits of the Transpac partnerships into criminal investigations of Adams, Volatile and Cofman well before it sought from these targets extensions of the statutes of limitations. To contend that Adams, Volatile and Cofman did not have a powerful incentive to ingratiate themselves to the government—be it the civil department of the IRS, the criminal division, or even the United States Attorney's Office—would be to be blind to reality. That the TMPs' interests and those of the ones who would be bound by their actions were in severe conflict cannot be doubted.

What makes matters especially disquieting in this case is that the Commissioner knew that the extensions were unwanted by the limited partners for whom the TMPs were purporting to act. For the Service had previously tried—and failed—to receive extensions from the individual limited partners and, only later, had gone after the embattled TMPs. When this fact is combined with the unrefuted allegation that the Service also misled those limited partners who had inquired as to the status of the civil audits by telling them to consult their TMPs (who, in turn, had been expressly ordered not to disclose the existence of criminal proceedings against them), the extent of the conflict becomes manifest. Indeed, this case becomes almost a paradigmatic example of why a party that stands to benefit from a conflict should not be the one to decide whether or not a conflict exists.

In sum, the criminal investigation created an overwhelming pressure on the TMPs to ignore their fiduciary duties to the limited partners.[8] As such, we cannot let them bind

---

8. It did so, moreover, under whatever standard for the existence of conflicts we might deem appropriate. In this respect, an argument can be made that the law of Delaware (where the partnership originated) should dictate the fiduciary responsibilities of a general partner in a limited partnership. *Cf. Barbados # 7 Ltd. v. Commissioner,* 92 T.C. 804, 812–13, 1989 WL 35567 (1989) (analyzing the effect of bankruptcy on the dissolution of a Utah partnership under Utah law, and holding that the partnership's TMP no longer had authority to bind the partnership). On the other hand, because petitioners' claim sounds in due process—that it would violate the Due Process Clause to bind petitioners to the acts of a TMP who had a disabling conflict of interest—an argument can also be made that the existence of a conflict must be examined under federal law. *Cf. Shutts,* 472 U.S. at 812, 105 S.Ct. 2965 (articulating as a matter of federal law the due process protections guaranteed to absent class members). Because we find that, on the facts of this case, the incentive to countermand the limited partners' intentions to deny extensions that was created by the Commissioner's (and, later, the U.S. Attorney's) scrutiny of the TMPs was so palpable, we believe that either jurisdiction's precedents would mandate the finding of a conflict. *Cf. Missouri–Indiana Investment Group v. Shaw,* 699 F.2d 952 (8th Cir.

these partnerships. *Cf. Sriram v. Preferred Income Fund III Ltd. Partnership,* 22 F.3d 498, 503 (2d Cir.1994) (taking the unusual step of appointing an independent liquidating trustee to wind up the affairs of a partnership because "the interests of the former general partner are in conflict with those of the limited partners in such a fundamental way that only an independent third party can and should make decisions regarding the ultimate disposition of the partnership[']s assets") (quoting district court opinion) (internal quotation marks omitted).

## III.

Having held that the TMPs had conflicts of interests that prevented them from acting as the representatives of the partnerships, we must next consider both the immediate effect of our holding and its ramifications for future cases. In the instant case, the conflicts resulted in a partnership that (at least until the Tax Court appointed appropriate substitutes) had *no* TMPs. This situation, were it to recur with frequency, might well impede the efficient administration of the tax laws. We nevertheless do not believe that the result offends TEFRA. Indeed, the phenomenon of "TMP-lessness" of a partnership is not unprecedented. *See, e.g., Barbados # 7 Ltd. v. Commissioner,* 92 T.C. 804, 810–12, 1989 WL 35567 (1989) (holding that sole TMP of a partnership who was disqualified as a TMP by virtue of bankruptcy had no authority to bind the partnership on tax matters).

Furthermore, we note that, to the extent that "TMP-lessness" might present a burden, the Service is excellently positioned to minimize its costs. As petitioners remind us, the Secretary has authority to appoint new TMPs. *See* 26 U.S.C. § 6231(a)(7). He did not, of course, attempt to exercise that authority in this case. But he certainly could, should an analogous situation arise in the

future. Alternatively, if the Secretary does not want to appoint new TMPs (or properly feels ill-positioned to do so on account of a conflict, *see Computer Programs Lambda, Ltd. v. Commissioner,* 90 T.C. 1124, 1127–28, 1988 WL 54149 (1988) ("*Lambda II* ")), he can send notice to the limited partners that the Service is removing the TMPs and, thereby, shift the duty to the partnerships to come up with their own replacements. *Cf. Seneca, Ltd. v. Commissioner,* 92 T.C. 363, 367–68, 1989 WL 11484 (1989) (Commissioner cured the TMP's inability to act for the partnership by mailing notice to all partners), *aff'd* 899 F.2d 1225 (9th Cir.1990) (unpublished memorandum decision). If, moreover, the partnerships prove recalcitrant, the IRS can always seek an order from the Tax Court to deal with the situation. *See* Tax Ct. Rule 250; *see also Lambda II,* 90 T.C. at 1126–27 (Tax Court possesses inherent authority to fill a vacancy in a partnership's TMP position).

■ Finally, and most important, we emphasize that, notwithstanding the inapplicability of the Criminal Investigations Regulation to this case, the Secretary undoubtedly has the authority under the Special Enforcement Provision of TEFRA to promulgate reasonable regulations providing for the removal and the replacement of TMPs in the event that a conflict of interest develops.[9] Such regulations would presumably avoid the difficulty that undermined the regulations that the Service sought to apply in this case: namely, that they vested sole authority in the IRS to determine *in its own discretion* when such a conflict had arisen. In this respect, we note that other regulations enacted under the Special Enforcement Provisions are triggered by the occurrence of an independent event. For example, the Bankruptcy Removal Regulation removes the TMP *auto-*

---

1983) (conflict of interest created by the general partner's affiliation with a separate venture with interests antagonistic to the limited partners). *See generally Boxer v. Husky Oil Co.,* 429 A.2d 995, 997 (Del.Ch.1981) (reiterating the fiduciary role of a general partner to his limited partners at Delaware law). Accordingly, we need not decide which law governs.

9. The elimination of conflicts, even if not addressed in the existing regulations, is surely an appropriate concern to the effective and efficient administration of the tax laws. *Cf. Lambda II,* 90 T.C. at 1128 n. 4 (suggesting that while it would be improper for the IRS to designate a new TMP when litigation between the partnership and the Commissioner is pending, such an appointment might be permissible during pre-litigation administrative proceedings).

*matically* upon the TMP's filing of a petition for bankruptcy. *See* Temp. Treas. Reg. § 301.6231(c)–7T. And it would be surprising if no analogue could be crafted that would likewise lead to automatic removal in cases of conflicts of interest.[10] In any event, these are questions for a later day, and we wish to underscore only that our holding's emphasis on what an executive agency *cannot* do should not obscure the many things that it *can* do to help remedy matters.

## IV.

We hold that the Tax Court erred in finding that, in the circumstances before us, the TMPs could validly execute extensions of the three-year statutes of limitations (or, more precisely, that the Tax Court erred in finding that the IRS's decision not to invoke the Criminal Investigations Regulation foreclosed a finding that the TMPs were precluded from extending the statutes). We note that our disposition of this appeal renders moot petitioners' separate argument regarding corporate forfeiture, which we decline to address. Finally, we add that our opinion in no way concludes this litigation. For respondent has expressly preserved its alternative argument that the six-year statute of limitations should properly apply to the tax years under dispute.[11]

REVERSED AND REMANDED.

---

**10.** The validity of such regulations would, of course, depend on the appropriateness of their definition of 'conflict. Similarly, determinations of when, in such situations, it is best for the Commissioner or for someone else to appoint a new TMP is also a matter that would require careful scrutiny. For as the Tax Court emphasized in *Lambda II*:

> Where a partnership is without a tax matters partner before this Court, we believe it is most appropriate for the Court to appoint the part-

nership's tax matters partner, rather than for [the Commissioner] to make the appointment because [the Commissioner] is the partnership's adversary during the litigation. An adversary should not appoint an opponent's representative.

*Lambda II*, 90 T.C. at 1127–28.

**11.** We, of course, make no comment on the merits of that claim.