T.C. Memo. 2006-164

UNITED STATES TAX COURT

LEATHERSTOCKING 1983 PARTNERSHIP, SAM I. BROWN,
A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2753-98.                    Filed August 14, 2006.

<u>Richard J. Sapinski</u> and <u>Edward A. Vrooman</u>,[1] for petitioner.

<u>Shawna A. Early</u>, <u>Gerard Mackey</u>, and <u>Tamara L. Kotzker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  This case is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax

_____

[1] Edward A. Vrooman signed the petition as petitioner's counsel and was allowed to withdraw after Richard J. Sapinski entered his appearance on Nov. 30, 1998.

Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 401, 96 Stat. 648. Sam I. Brown, a partner other than the tax matters partner of Leatherstocking 1983 Partnership (Leatherstocking), petitioned the Court to readjust partnership items respondent adjusted for 1983 and 1984. Respondent determined that Leatherstocking could not deduct $950,907 and $569,940 of expenses for the respective years because it failed to establish that its activities were entered into for profit or for the production of income, or that the "alleged transaction" had economic substance or reality. Petitioner alleged in the petition that respondent erred in his determination because Leatherstocking's activities were entered into for profit and for the production of income, and the "alleged transaction" did have economic substance and reality.

On November 2, 1998, petitioner moved the Court for leave to amend the petition to allege that respondent had issued the underlying notices of final partnership administrative adjustment (FPAAs) after the periods of limitation had expired. The motion noted that the Court of Appeals for the Second Circuit had recently decided Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d 221 (2d Cir. 1998), revg. and remanding T.C. Memo. 1994-26, and stated that the court in that case had "found on substantially similar facts as the instant case that, as a result of being placed under investigation by the Internal

Revenue Service, the tax matters partners of various partnerships labored under a conflict of interest and, thereby, were disqualified from binding the partnerships by extending the assessment period."  The motion stated further that Leatherstocking's tax matters partner (TMP), Robert L. Steele (Steele), had been under investigation by the Commissioner's Criminal Investigation Division (CID).  This Court allowed petitioner to amend the petition on November 4, 1998, to challenge the timeliness of the FPAAs.  When the case was called for trial, petitioner conceded all allegations of error initially set forth in the petition and stated that he was henceforth relying solely on the allegation that the FPAAs were issued untimely.

We decide whether the periods of limitation for assessment as to Leatherstocking's limited partners remain open for the subject years.  We hold they do.  Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.

FINDINGS OF FACT

1.  Preface

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulations of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly.

2. <u>Leatherstocking</u>

Leatherstocking is a New York limited partnership that was inactive when its petition was filed with the Court. When it was active, Leatherstocking's business offices were located in New York, New York. Leatherstocking's organizer and only general partner is Steele. Leatherstocking had 34 limited partners during each subject year.

Leatherstocking's operation involved a cattle breeding and embryo transfer venture conducted at the Leatherstocking Farm in Easton, New York. Through the venture, Leatherstocking produced embryos fertilized from Black Angus cows and the sperm of a Black Angus bull named "High Voltage". The venture was conducted primarily as a tax shelter.

Leatherstocking was one of many entities formed by Steele in 1983 through 1986 to syndicate interests in High Voltage or to own or market cattle or their embryos. Those entities included eight limited partnerships, the sole general partner of whom was either Steele or his wholly owned corporation. One of the other partnerships was Leatherstocking High Voltage Limited Partnership (High Voltage Limited Partnership), through which interests in High Voltage were syndicated in 1985. Another entity was Roblis Enterprises, Ltd. (Roblis), an S corporation wholly owned in form by Steele's wife. Roblis owned and operated the Leatherstocking Farm.

3.   The Start of Respondent's Audit of Leatherstocking's 1983
     and 1984 Partnership Returns of Income

Leatherstocking filed a 1983 and a 1984 Form 1065, U.S.
Partnership Return of Income, on May 29, 1984, and April 22,
1985, respectively.  In 1985, respondent selected the 1983 return
for audit and assigned the case to Jane Hursty (Hursty).  Hursty
later notified Leatherstocking that its 1984 return also was
selected for audit.  In late 1986 or early 1987, respondent
notified Leatherstocking's limited partners that Leatherstocking
was being audited.

During respondent's audit of Leatherstocking, respondent
received various consents (consents) to extend the periods of
limitation for the subject years.[2]  The consents were signed by
Steele in his capacity as Leatherstocking's TMP or, in the case
of a consent signed on February 4, 1988, by Daniel Kornblatt
(Kornblatt) in his capacity as Leatherstocking's attorney and
authorized representative.  The relevant details of the consents
for 1983 were as follows:

| Date signed by Steele | Date signed by respondent | Extended date for assessment |
|---|---|---|
| Nov. 18, 1986 | Nov. 24, 1986 | Dec. 31, 1987 |
| Aug. 12, 1987 | Aug. 14, 1987 | Dec. 31, 1988 |
| July 7, 1988 | Aug. 31, 1988 | Dec. 31, 1989 |
| Aug. 14, 1989 | Sept. 8, 1989 | Dec. 31, 1990 |
| May 30, 1990 | June 8, 1990 | Dec. 31, 1991 |

---

[2] Each consent was given by way of Form 872-P, Consent to
Extend the Time to Assess Tax Attributable to Items of a
Partnership.

| June 16, 1991 | June 21, 1991 | Dec. 31, 1993 |
| Dec. 15, 1993 | Dec. 28, 1993 | Dec. 31, 1995 |
| May 8, 1995 | June 12, 1995 | Dec. 31, 1996 |
| Sept. 23, 1996 | Oct. 2, 1996 | Dec. 31, 1997 |

The relevant details of the consents for 1984 were as follows:

| Date signed by Steele or Kornblatt | Date signed by respondent | Extended date for assessment |
| --- | --- | --- |
| Feb. 4, 1988 | Mar. 1, 1988 | Dec. 31, 1988 |
| Sept. 6, 1988 | Sept. 13, 1988 | Dec. 31, 1989 |
| Aug. 24, 1989 | Sept. 8, 1989 | Dec. 31, 1990 |
| May 31, 1990 | June 8, 1990 | Dec. 31, 1991 |
| June 16, 1991 | June 21, 1991 | Dec. 31, 1993 |
| Dec. 15, 1993 | Dec. 28, 1993 | Dec. 31, 1995 |
| May 8, 1995 | June 12, 1995 | Dec. 31, 1996 |
| Sept. 23, 1996 | Oct. 2, 1996 | Dec. 31, 1997 |

4. Steele's Criminal Activities

In or about August 1986, Steele and three of his coconspirators (we refer collectively to Steele and one or more of the conspirators as coconspirators) traveled to Hawaii to meet with Ferdinand Marcos (Marcos), who was then in exile there. The coconspirators offered to help Marcos return to power in the Philippines. The coconspirators first offered to return Marcos to power peacefully in return for at least $180,000. In September 1986, Marcos transferred $180,000 to the coconspirators by wiring that amount from a foreign account to an account of one of Steele's corporate entities, Commonwealth Group, Ltd. In October 1986, Marcos wired another $1 million to the Commonwealth account.

When the peaceful efforts failed, the coconspirators offered to return Marcos to power forcefully by way of a coup. The

coconspirators told Marcos that they wanted $100 million if the coup succeeded and that $15 million of that amount would have to be paid immediately. In or about December 1986, the coconspirators directed Steele's cousin, Michael Seifert (Seifert), a solicitor in London, to open bank accounts on the Isle of Man in the names of nominee corporations in order to receive and conceal funds relating to the planned coup. In January 1987, Steele caused an account (First Hi-Tech account) to be opened at First City National Bank & Trust in New York, New York, in the name of First Hi-Tech Co. On February 1, 1987, Marcos wired at least $8 million to the escrow account of Seifert's firm in London, and 2 days later, Seifert transferred $1.8 million to the First Hi-Tech account. Between February 3 and 19, 1987, Steele caused approximately $1,140,000 of the $1.8 million to be withdrawn from the First Hi-Tech account in amounts less than $10,000.

5. <u>Government Learns About the Planned Coup</u>

    a. <u>New Jersey Investigation</u>

The planned coup collapsed in March 1987 when two of the coconspirators (other than Steele) were arrested in New Jersey trying to buy weapons from one or more undercover agents. This arrest caused the U.S. Attorney for the District of New Jersey to open an investigation that led to the filing on March 5, 1992, in the District of New Jersey of Information Crim. No. 92-122 (AJL).

This information charged Steele with one count of conspiracy to violate the Arms Export Control Act by scheming in 1986 and 1987 to buy weapons to use in the planned coup and to make false statements to obtain weapons export licenses from the Department of State. Steele pleaded guilty to that information on the day it was filed.

b. <u>Colorado Investigation</u>

In or about 1989, the U.S. Attorney for Colorado also began investigating Steele for securities fraud relating to the High Voltage Limited Partnership. Steele was later indicted in Colorado on mail, wire, and securities fraud violations allegedly committed in 1984 and 1985 arising out of misrepresentations and material omissions made in the marketing of the bull named High Voltage and the sale of its semen and resulting embryos. This indictment was filed in the District of Colorado as Indictment Crim. No. 92-150 (AJL). On March 5, 1992, Steele pleaded guilty to one count of this indictment, specifically, the count that charged him with securities fraud.

c. <u>New York Investigation</u>

The withdrawals from the First Hi-Tech account also caused the U.S. Attorney for the Southern District of New York to open an investigation as to the withdrawals. This investigation led to the filing on September 9, 1992, in the Southern District of New York of Information Crim. No. 92-751. This information

charged Steele with one count of structuring the transactions in the First Hi-Tech account to evade the currency transaction reporting requirements of 31 U.S.C. sec. 5313(a), in violation of 31 U.S.C. secs. 5322(b) and 5324(a)(3) and 18 U.S.C. sec. 2.

In September 1992, Steele and the U.S. Attorney for the Southern District of New York agreed that Steele would plead guilty to this information and that the information would be transferred to the District of New Jersey (the resulting case filed as Crim. No. 92-513 (AJL)), so that Steele could be sentenced in one proceeding on his separate pleas of guilty in New York, New Jersey, and Colorado. The September 1992 plea agreement stated that if Steele complied with the understandings contained in the agreement, neither the U.S. Attorney for the Southern District of New York nor the Tax Division of the Department of Justice, as applicable, would prosecute Steele for any crime related to: (1) His participation in the conspiracy to return Marcos to power in the Philippines, (2) "his failure to report as income millions of dollars he received from Ferdinand Marcos in 1986 and 1987", (3) "the validity of the Leatherstocking Farm as an entity entered into for profit, and the validity of the [eight] Leatherstocking Partnerships" (including Leatherstocking), and (4) "his failure to file personal income tax returns for calendar years 1987 through 1990 and his failure to file for Roblis Enterprises Ltd., U.S. Income

Tax Returns for an S Corporation, for the calendar years 1987 through 1990."  In relevant part, the September 1992 agreement required that Steele:  (1) File "accurate" 1986 through 1991 Federal tax returns (or amended tax returns if applicable) for himself and for Roblis, (2) pay or agree to pay to the Internal Revenue Service any income tax that is owed by him, by any related entity, or by any entity that he controls, and any withholding tax that he failed to pay over to the Internal Revenue Service from 1983 to present, and (3) "cooperate fully with the IRS in an expeditious manner in order to resolve his tax liability and any tax liability and examinations of" entities that included Leatherstocking, Roblis, and some other entities related to Leatherstocking.  The September 1992 agreement did not require Steele to sign any of the consents at issue here and stated specifically that "this Agreement is in no way intended to require Robert L. Steele to give up any rights he may have to contest IRS determinations during any administrative or civil actions".

On October 6, 1992, Steele pleaded guilty to the one-count criminal information filed in the Southern District of New York.  On June 4 and July 8, 1993, Steele was sentenced on all three of the charges to which he had pleaded guilty, and he was ordered to report to prison on August 27, 1993.  Steele's sentence was 7 years of imprisonment and a $20,000 fine for the charge in

Colorado, 5 years of imprisonment (to run concurrently with the previous sentence) and a $20,000 fine for the charge in New York, and 5 years of probation (to run consecutively to the 7 years of imprisonment) for the charge in New Jersey. The Government's sentencing memorandum in Steele's criminal proceedings stated that Steele's "failing to report his Marcos income * * * [and the issues relating to] the partnerships of Steele formed to market cattle embryos were better left to the IRS civil audit."

d. Hawaii Investigation

In addition to the above, the Department of Justice organized a task force in or about 1986 to investigate the activities in the U.S. of Marcos and his associates. The Department of Justice delegated the responsibility for this investigation to the U.S. Attorney for the District of Hawaii. This investigation was later reflected in the charges that were filed in New Jersey.

e. Steele's Proffer

During his criminal proceedings, Steele was represented by counsel and proffered himself to the U.S. Attorneys for New Jersey and Hawaii as a witness against Marcos and the other individuals involved in the planned coup. The U.S. Attorneys declined those proffers. Steele did not proffer himself as a witness to respondent in any action relating to the audit or operation of Leatherstocking.

6. Culmination of the Audit of the Subject Years

Respondent had placed the Leatherstocking audit in suspense on July 15, 1991, because a grand jury had been convened in New York to investigate Steele as to his structuring of funds related to the planned coup, his receipt of the unreported income from Marcos, and his failure to file personal Federal income tax returns. Beforehand, in June 1989, respondent had transferred the Leatherstocking audit to Harold Kerzner (Kerzner). Respondent had made that transfer to associate the Leatherstocking audit with other related audits assigned to Kerzner. Two of those other related audits involved (1) the 1983 through 1986 personal income tax returns of Steele and his wife and (2) the 1983 through 1986 taxable years of Roblis.[3]

Kertzner never audited Leatherstocking. His responsibility and primary action with respect to the Leatherstocking audit was to obtain the consents that he secured between June 1989 and January 1994. Kertzner did not speak to Steele personally to

---

[3] As to Steele's personal income tax returns, Kertzner expanded his audit in or about October 1989 to include Steele's 1986 through 1988 taxable years. By February 1990, Kertzner had learned that Steele had not filed his 1987 and 1988 returns. By June 1990, Kertzner began analyzing bank records. These analyses ultimately led to respondent's discovery that Steele had failed to report his receipt of income from Marcos. In December 1990, Kertzner referred the matter of Steele's personal income taxes to the CID for fraud. On Feb. 20, 1991, Kertzner was notified by the CID that his referral had been accepted for investigation. Between March and June 1991, Kertzner worked with agents from the CID on various issues relating to that referral.

obtain those consents but obtained them from Steele by contacting Leatherstocking's authorized representatives.  Kerzner did not threaten Steele or offer him any incentive to agree to the consents.

Respondent resumed his audit of Leatherstocking in January 1994.  At that time, respondent assigned the audit to Revenue Agent Robert Clements (Clements).  Respondent also assigned to Clements the audits of the other entities related to Leatherstocking.  Kerzner was not assigned those audits because he had worked on the grand jury case involving Steele.

During his audit of Leatherstocking, Clements did not personally speak with or meet with Steele, who was then in prison, but primarily corresponded with Steele by mail.  In obtaining the consents that Steele signed after January 1994, Kerzner did not threaten Steele or offer him any incentive to agree to the consents.  Nor did Clements ever ask the limited partners of Leatherstocking to sign consents individually. Clements never had any contact with the Leatherstocking limited partners regarding the audit of Leatherstocking.

On September 16, 1997, respondent issued the FPAAs for the subject years.  Respondent never issued to Steele written notification that his partnership items would be treated as nonpartnership items.  Respondent never issued to Steele written notification that he was under criminal investigation.

7. <u>Current Status</u>

Steele is a fugitive from justice, and his whereabouts are unknown.  Respondent filed an unopposed motion to remove Steele as Leatherstocking's TMP on April 28, 2003.  Pursuant to an order of the Court dated July 16, 2003, Steele was removed as Leatherstocking's TMP on the same day.  On December 5, 2003, the Court granted the motion of participating partner Philip Wallach to be appointed substitute TMP for purposes of this litigation.

OPINION

As part of TEFRA, Congress enacted audit and litigation procedures to provide for the unified treatment of partnership income, loss, deductions, and credits among the partners.  See H. Conf. Rept. 97-760, at 600 (1982), 1982-2 C.B. 600, 662. Under TEFRA, the tax treatment of any partnership item is generally determined at the partnership level.  See sec. 6221; see also sec. 6231(a)(3) (partnership item means, with respect to a partnership, an item that is more appropriately determined at the partnership level than at the partner level, according to applicable regulations).  Any dispute regarding the tax treatment of a partnership item is resolved at the partnership level in a unified partnership proceeding held in an administrative or judicial forum, see secs. 6226, 6227, and 6228, and the TMP is required to keep the other partners informed of the happenings in those proceedings, see sec. 6223(g).  The TMP is usually the

general partner designated by the partnership to handle tax matters or, if no general partner is so designated, the general partner with the largest profits interest in the partnership at the close of the taxable year. See sec. 6231(a)(7); Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d at 223 n.1. Where the partnership has not designated its tax matters partner and the Commissioner determines that it is impracticable to determine which general partner has the largest profits interest, the tax matters partner is that general or limited partner selected by the Commissioner. See sec. 6231(a)(7); sec. 301.6231(a)(7)-1T, Temporary Proceed. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987); see also Transpac Drilling Venture 1982-12 v. Commissioner, supra at 223 n.1.

Petitioner argues that respondent may not assess Federal income tax as to either subject year because the 3-year periods of limitation under section 6229(a) have expired as to those years. Generally, the Commissioner must assess Federal income tax as to a partnership item (or affected item) within 3 years after the later of (1) the date on which the partnership files its partnership return for the taxable year of assessment or (2) the last date for filing that return (without extension). See Madison Recycling Associates v. Commissioner, 295 F.3d. 280, 286

(2d Cir. 2002) (citing sec. 6229(a)), affg. T.C. Memo. 2001-85.[4]
If the Commissioner issues a timely FPAA to the taxpayer, the
period of limitation is suspended "for the period during which an
action may be brought under section 6226 (and, if a petition is
filed under section 6226 with respect to such administrative
adjustment, until the decision of the court becomes final), and *
* * for 1 year thereafter."  Sec. 6229(d)(1) and (2).

The expiration of the period of limitation on assessment is
an affirmative defense, and petitioner, as the party relying upon
that defense, must plead the defense and prove its applicability.
See Madison Recycling Associates v. Commissioner, supra at 286;
Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240
(1990); see also Chimblo v. Commissioner, 177 F.3d 119, 125 (2d
Cir. 1999), affg. T.C. Memo. 1997-535.  Petitioner must make a
prima facie case showing that the periods of limitation have
expired by establishing the filing of the partnership returns,
the expiration of the statutory periods, and the receipt or

---

[4] Notwithstanding sec. 6229(a), sec. 6501 establishes a
period of limitations for making assessments attributable to
Federal income tax.  While in certain cases the period of
limitations under sec. 6501 may remain open even though the
period of limitations has expired under sec. 6229, see Andantech
L.L.C. v. Commissioner, 331 F.3d 972, 977 (D.C. Cir. 2003), affg.
in part and remanding in part T.C. Memo. 2002-97; Rhone-Poulenc
Surfactants & Specialities, L.P. v. Commissioner, 114 T.C. 533
(2000), appeal dismissed and remanded 249 F.3d 175 (3d Cir.
2001), neither party claims that this is one of those cases.
Instead, as framed by the parties, this case turns on whether the
period of limitations remains open under sec. 6229.

mailing of the FPAAs after the running of those periods.  See

Madison Recycling Associates v. Commissioner, supra at 286;

Amesbury Apartments, Ltd. v. Commissioner, supra at 240-241.  If

petitioner makes such a showing, the burden of production shifts

to respondent to show that the bar of the periods of limitation

does not apply.  See Madison Recycling Associates v.

Commissioner, supra at 286; Transpac Drilling Venture 1982-12 v.

Commissioner, supra at 224 n.5; Amesbury Apartments, Ltd. v.

Commissioner, supra at 241.  If respondent makes such a showing,

the burden of production shifts back to petitioner to establish

that the claimed exception to the expiration of the limitation

periods is ineffective or otherwise inapplicable.  See Madison

Recycling Associates v. Commissioner, supra at 286; Amesbury

Apartments, Ltd. v. Commissioner, supra at 241.  While the burden

of production may shift in this manner, the burden of persuasion

never shifts from petitioner but remains with petitioner.  See

Madison Recycling Associates v. Commissioner, supra at 286;

Amesbury Apartments, Ltd. v. Commissioner, supra at 241.

Petitioner has pleaded a claim to the affirmative defense

that the periods of limitation have expired as to the subject

years, and petitioner has met the initial burden of production as

to that claim.  As to the latter, the record establishes the

dates on which the subject returns were filed and that the FPAAs

were issued to Leatherstocking more than 3 years after the

corresponding dates. Accordingly, assessments for the subject years are barred by the 3-year rule of section 6229(a), given that Leatherstocking filed the subject returns on May 29, 1984, and April 22, 1985, respectively, and respondent issued the FPAAs more than 3 years later, on September 16, 1997.

Respondent argues that the 3-year rule of section 6229(a) does not apply because the periods of limitation for assessment for both years were extended to December 31, 1997, or in other words, to a date after the FPAAs were issued. The 3-year period of limitation set forth in section 6229(a) is extended with respect to all partners if, before that period expires (including any periods covered by a prior extension), the Commissioner receives the consent of: (1) All partners or (2) the partnership's TMP or any other person authorized by the partnership in writing to enter into such an agreement. See sec. 6229(b)(1); Transpac Drilling Venture 1982-12 v. Commissioner, supra at 224. Petitioner acknowledges that Steele, designated Leatherstocking's TMP, executed Forms 872-P with respect to Leatherstocking. Respondent also produced the facially valid forms to rebut petitioner's periods of limitation defense. See Lefebvre v. Commissioner, T.C. Memo. 1984-202 (consent to extend a period of limitation is valid on its face if it is signed before the end of the limitation period and includes the name of the taxpayer, the signature of the taxpayer or a person

authorized to sign on the taxpayer's behalf, and the taxable year to which the agreement relates), affd. 758 F.2d 1340 (9th Cir. 1985).  Respondent has met his burden of production as to this issue, and the burden of production now shifts back to petitioner to show that the consents are invalid.

Petitioner argues that the consents are invalid as to Leatherstocking's limited partners for two reasons.  First, petitioner argues that the consents which Steele signed after June 1990 were signed by him when he had a disabling conflict of interest vis-a-vis the limited partners in that their personal interests "radically diverged" so as to make Steele incapable of extending the periods of limitation beyond December 31, 1990. Petitioner asserts that such a conflict arose because Steele signed the consents to avoid his criminal referral for not filing his Federal income tax returns and to avoid alerting the limited partners to the fact that he was stealing from them.  Petitioner also asserts that such a conflict arose when Steele was under criminal tax investigation and that his ability to consent on behalf of Leatherstocking was compromised when he was in prison. Petitioner asserts that respondent obviously knew (or should have known) as of June 1990 that the interests of Steele as to the Leatherstocking audit were different from the interests of the limited partners because Kertzner had learned by that time that Steele was stealing from the limited partners.  Second,

petitioner argues, the consents which Steele signed after July 1991 were invalid because respondent should have removed Steele as TMP on account of the grand jury investigation.  According to petitioner, respondent's failure to remove Steele as TMP by sending the notices referenced in section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6793 (Mar. 5, 1987), was an abuse of discretion.

We reject both of petitioner's arguments.  As to the first, i.e., a claimed disabling conflict of interest, we are not persuaded that Steele's interests as to the Leatherstocking audit differed from the interests of the Leatherstocking limited partners, so as to constitute a breach of any fiduciary duty that he owed to them.  Nor does the record establish more specifically that a conflict of interest was present as to Steele's granting of the consents, or that respondent ever perceived that a conflict existed between Steele's interests and those of his partners.  Indeed, while petitioner called three limited partners to testify at trial, none of them testified that he would have objected to the consents had he known about them when they were signed.[5]

---

[5] Moreover, as to the reasons proffered by petitioner, we do not find as a fact that Steele granted the consents to avoid his criminal referral for failing to file his Federal income tax returns, or that he granted the consents to conceal any theft from the Leatherstocking limited partners.  To the contrary, given the number of consents Steele signed during the

(continued...)

Petitioner seeks a contrary result, relying upon <u>Transpac Drilling Venture 1982-12 v. Commissioner</u>, 147 F.3d 221 (2d Cir. 1998).  There, the Court of Appeals for the Second Circuit held that extensions signed by TMPs who were cooperating witnesses in a criminal tax and related grand jury investigation of the promoter of the Transpac partnerships were invalid.  The court held that the TMPs were under a disabling conflict between their personal interests as immunized cooperating Government witnesses and their duties to the limited partners they purported to represent.  The court noted that the nature of the conflict was obvious and known by the Commissioner.

The facts here do not support a finding that Steele was under a disabling conflict when he signed the consents.  In <u>Madison Recycling Associates v. Commissioner</u>, 295 F.3d 280 (2d Cir. 2002), the Court of Appeals for the Second Circuit distinguished <u>Transpac Drilling Venture 1982-12 v. Commissioner</u>, <u>supra</u>, and indicated that a disabling conflict of interest is not necessarily present merely because a TMP is under criminal investigation.  See <u>Madison Recycling Associates v. Commissioner</u>, <u>supra</u> at 288 ("Our decision in <u>Transpac</u> was based on * * * an actual conflict.  We did not hold that the existence of a

_____

[5](...continued)
approximately 10-year period from Nov. 18, 1986, through Sept. 23, 1996, it appears that his signing of the consents was merely a matter of routine rather than, as petitioner would have us find, a quid pro quo furthering Steele's self-interests.

criminal investigation by the IRS automatically disqualifies a TMP or his representative from negotiating or entering into agreements with the IRS").  In addition, as this Court has noted: "'the mere existence of an investigation * * * [targeting the tax matters partner does not, in and of itself,] subvert a tax matters partner's judgment and bend him to the government's will in dereliction of his fiduciary duties to his partners.'" Phillips v. Commissioner, 114 T.C. 115, 132 (2000) (quoting Olcsvary v. U.S., 240 Bankr. 264, 266-267 (E.D. Tenn. 1999")), affd. 272 F.3d 1172 (9th Cir. 2001).

We find that Transpac Drilling Venture 1982-12 v. Commissioner, supra, is factually distinguishable from the setting at hand.  There, the Commissioner asked the TMPs to extend the periods of limitation after the limited partners had refused to do so; the Commissioner promised the TMPs leniency in their own criminal exposure if they cooperated in the criminal investigation of the partnerships' promoter; and the Commissioner told the limited partners to contact the TMPs regarding the examination of the partnerships but instructed the TMPs to conceal from them the criminal investigation.  See id. at 223-227.  In sum, the TMPs in Transpac Drilling Venture 1982-12 v. Commissioner, supra at 227, were under "overwhelming pressure" to ignore their fiduciary duties to the limited partners in that the TMPs' discharge of those duties was subverted by their own

criminal problems and the Commissioner's efforts to bend them to his will. Here, by contrast, respondent's agents never asked any of Leatherstocking's limited partners to extend the periods of limitations for the subject years. Nor do we find that Steele tried to ingratiate himself with respondent, that Steele signed the consents because of the criminal investigations or the fraud referral, or that the consents were signed for a grant of immunity or in exchange for other favorable treatment. We also do not find that respondent attempted to mislead the Leatherstocking limited partners about the existence of Steele's criminal problems or instructed Steele to do so.[6]

Petitioner also argues that respondent was required to remove Steele as TMP on account of the criminal investigation of Steele and that respondent's failure to do so was an abuse of discretion. We disagree. In the case of a criminal investigation, section 6231(c)(2) provides that partnership items become nonpartnership items "To the extent that the Secretary determines and provides by regulations that to treat items as

---

[6] Petitioner also asserts that respondent knew by July 1993 that Steele was a "narcissistic sociopath who had no regard for anyone or anything except himself and his own needs", and that respondent had a "powerful incentive" in and after June 1990 to delay the conclusion of the audit of the subject years in that such a delay allowed respondent to determine fraud against Steele. The record does not support a finding of either of these assertions.

partnership items will interfere with the effective and efficient enforcement of this title".  The regulations state:

> The treatment of items as partnership items with respect to a partner under criminal investigation for violation of the internal revenue laws relating to income tax will interfere with the effective and efficient enforcement of the internal revenue laws. Accordingly, partnership items of such a partner arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner to which the criminal investigation relates shall be treated as nonpartnership items as of the date on which the partner is notified that he or she is the subject of a criminal investigation and receives written notification from the Service that his or her partnership items shall be treated as nonpartnership items.  The partnership items of a partner who is notified that he or she is the subject of a criminal investigation shall not be treated as nonpartnership items under this section unless and until such partner receives written notification from the Service of such treatment.  [Sec. 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6793 (Mar. 5, 1987).]

Petitioner concedes that respondent never sent Steele a notice that he was under investigation for violation of internal revenue laws or that his partnership items would be treated as nonpartnership items.

Petitioner argues that the regulations do not set forth the exclusive cause to remove a TMP following the start of a criminal investigation.  Notwithstanding the regulations, petitioner asserts, Steele suffered from a disabling conflict of interest that required respondent to terminate Steele's status as Leatherstocking's TMP.  While we agree with petitioner that the regulations do not set forth the exclusive reason for removing a

TMP after the start of a criminal investigation, see Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d at 227, we disagree with petitioner that Steele suffered from a conflict of interest that required respondent's removal of Steele as Leatherstocking's TMP.

A decision that a TMP is disqualified from serving as such following the start of a criminal investigation turns on the facts and circumstances of the case, cf. Madison Recycling Associates v. Commissioner, 295 F.3d at 289, and we are not persuaded on the basis of the facts and circumstances at hand that Steele ever lost the ability to carry out properly his fiduciary duty to his fellow partners in his handling of the Leatherstocking audit. Although Steele was under criminal investigation by the CID and at least one grand jury, those investigations, as they related to tax, focused primarily on Steele's personal income tax situation. Moreover, while Steele's 1992 plea agreement required that he "cooperate fully" with respondent in the audit of Leatherstocking, that agreement did not compel Steele to grant any of the consents that he did. As a matter of fact, that agreement stated specifically that Steele was not surrendering any rights that he had to contest respondent's determinations in a civil matter such as the

Leatherstocking audit.[7] Nor do we believe that respondent was precluded from dealing with Steele as Leatherstocking's TMP simply because he was imprisoned.

In sum, we do not find on the basis of the record at hand that respondent obtained any of the consents by impermissible means or that Steele had a serious conflict of interest with the Leatherstocking partners as to the Leatherstocking audit. We hold that the periods of limitation remain open for the subject years. We have considered all arguments by petitioner for a contrary holding and find those arguments not discussed herein to be without merit. Given petitioner's concession of all of the underlying adjustments in the FPAAs,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[7] We also are mindful that the Government's sentencing memorandum in Steele's criminal proceedings stated that Steele's "failing to report his Marcos income * * * [and the issues relating to] the partnerships of Steele formed to market cattle embryos were better left to the IRS civil audit."