T.C. Memo. 2017-151

UNITED STATES TAX COURT

BCP TRADING AND INVESTMENTS, LLC, WILLIAM T. ESREY TRADING
PARTNERS, LP, A PARTNER OTHER THAN THE TAX MATTERS
PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10200-08, 10201-08.          Filed August 7, 2017.

Robert H. Albaral, David G. Glickman, George M. Clarke, III, and Mireille

R. Oldak, for petitioner.

George M. Gerachis, Michael L. Charlson, David C. Cole, and Juliana D.

Hunter, for intervenor Kalkhoven/Pettit Trading Partners, LP, tax matters partner.[1]

Robert E. McKenzie and Kathleen M. Lach, for PCMG Trading Partners VI,

LP, a partner other than the tax matters partner.

_____

[1] These attorneys also represent PCMG Trading Partners XII, LP, and
Kalkhoven/Pettit #2 Trading Partners, LP.

[*2]   <u>Roy Wulf</u>, <u>Ewan D. Purkiss</u>, <u>Mary E. Wynne</u>, <u>Kevin G. Croke</u>, <u>L. Katrine</u>

<u>Shelton</u>, and <u>Henry C. Bonney, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  These cases are about a purported partnership that used

almost perfectly offsetting bets on foreign currency to pass over $3.3 billion of tax

losses through to its partners--partners who contributed only $16.5 million.  These

massive losses were passed through to some very wealthy corporate executives,

who used them to eliminate millions of dollars in tax.  The Commissioner thinks

this is just another Son-of-BOSS deal.[2]  The partners' first defense is that we lack

jurisdiction.  They then argue that if we do have jurisdiction, the Commissioner

caught them too late.  And if this statute-of-limitations argument fails, they say

---

[2] Son-of-BOSS is a variation of a slightly older alleged tax shelter known as
BOSS, an acronym for "bond and options sales strategy."  There are a number of
different types of Son-of-BOSS transactions, but what they all have in common is
the transfer of assets encumbered by significant liabilities to a partnership, with
the goal of increasing basis in that partnership.  The liabilities are usually
obligations to buy securities, and typically are not completely fixed at the time of
transfer.  This may let the partnership treat the liabilities as uncertain, which may
let the partnership ignore them in computing basis.  If so, the result is that the
partners will have a basis in the partnership so great as to provide for large--but
not out-of-pocket--losses on their individual tax returns.

**[*3]** this complex transaction was really just about diversification and that's a perfectly permissible business purpose.

FINDINGS OF FACT

A.   The Players

1.   Kalkhoven and Pettit

Son-of-BOSS deals are usually complex--intentionally so according to the IRS.  And this particular web was spun by a group of especially sophisticated and wealthy corporate executives, partners, and partnerships.  We begin unraveling it by looking first at two corporate executives who owned multiple partnerships in these cases--Kevin Kalkhoven and Danny Pettit.  After high school, Kalkhoven went straight to work for IBM as a programmer and was later promoted to system analyst.  Other companies took notice of his abilities, and he was hired as the marketing director of a computer time-sharing company.  The company soon promoted him to COO and made him responsible for reshaping the company.  It didn't take long for other companies to try to poach Kalkhoven--including JDS Uniphase Corporation (JDS)--which brought him in as its CEO and tasked him with the job of turning it around too.  In 1999 and 2000 he had worked his way up to become the cochairman and CEO of JDS.

**[*4]** Pettit also had a very successful career. He earned his undergraduate degree in Minnesota and an MBA from Pepperdine. After Pepperdine, Pettit worked his way up the corporate ranks through various positions and found his niche as an artist of the turnaround. Later, Pettit accepted a position as CFO at JDS and remained in that position until 1997 when JDS re-purposed him. JDS grew quickly during Kalkhoven and Pettit's tenure, and there soon was a need for someone to run its European operations. JDS thought Pettit was just the man for the job, so it made him president of European Operations. He moved back to the States in early 2000 and worked on a special project--finding a new direction for the corporation--until he retired in September 2000.

As executives at JDS, Kalkhoven and Pettit were extremely well compensated, and part of their compensation was lucrative stock options. They partially exercised these options in 2000 and 2001. On their 2000 and 2001 tax returns, Kalkhoven and Pettit reported income of:

| Year/type of income | Kalkhoven | Pettit |
|---|---|---|
| 2000 income from salary | $492,523,000 | $192,402,000 |
| 2000 capital gains | 35,399,000 | 35,446,000 |
| 2001 income from salary | 67,235,000 | 8,000,000 |
| 2001 capital gains | 67,750,000 | 124,321,000 |

**[*5]** 2.　　Esrey and LeMay

William Esrey and Ronald LeMay are the other two corporate executives in these cases. Both were longtime executives at the telecommunication giant Sprint Corporation (Sprint). Esrey came to Sprint as an executive vice president of corporate planning but was promoted to CFO and in 1985 promoted again to CEO. LeMay began his career as a mere lawyer and earned his law degree from the University of Arkansas in 1972. He went to work as a lawyer for Southwestern Bell, and became that Baby Bell's chief legal counsel in Arkansas. But his aptitude for management--and indeed what turned out to be entrepreneurial talents--stretched out against the confines of a JD and he decided in 1979 to leave law for a management position at Southwestern Bell. It was the perfect time--AT&T was about to be split into the seven Baby Bell companies and the telecommunications revolution was about to be unleashed. He moved to AT&T and became its vice president. In 1985 he moved again to what would become Sprint, and in 1996 became Sprint's COO (and with the expectation that he would succeed Esrey as CEO). As COO, he was involved in every significant strategic decision; and by the time he left Sprint it had grown from a local phone company to a giant in the industry, raking in $28 billion in revenue with offices in 35

**[*6]** countries. It all crashed for Esrey and LeMay in 2003 when they were fired for using questionable tax strategies--including the one at issue here.

Like Kalkhoven and Pettit, Esrey and LeMay were well compensated during their time at Sprint. Each held over $100 million in Sprint stock options, and on their 2000 and 2001 tax returns they reported income of:

| Year/type of income | Esrey | LeMay |
|---|---|---|
| 2000 income from salary | $83,725,000 | $157,432,000 |
| 2000 capital gains | 123,059,000 | 49,494,000 |
| 2001 income from salary | 1,575,000 | 1,157,000 |
| 2001 capital gains | 80,537,000 | 95,256,000 |

Needless to say, all four executives were sitting on enormous amounts of taxable income in 2000 and 2001. In those years successful businessmen like these executives, accountants, and other tax sharpies viewed such large taxable incomes as neither good fortune nor great reward but as a big problem that called for an expensive solution.

Enter Ernst & Young.

3.    E&Y and Its Complex Solution

Ernst & Young LLP (E&Y) had an all-too-good-to-be-true way to avoid the monstrous tax bills that usually follow the receipt of enormous amounts of taxable

[*7] income.  In 1998 E&Y hatched a group called Value Ideas Produce

Extraordinary Results--VIPER.[3]  Through VIPER, E&Y designed and marketed

very high-fee tax strategies that very high-net-worth clients could use to very

nearly eliminate (or at least defer) their tax bills.  VIPER at first aimed only at

clients with at least $20 million to shelter, but that number later grew to $40

million.  VIPER measured its success not by the revenue it generated for clients

but by the amount of tax losses it sold.

One particularly lucrative strategy it used was called the Contingent

Deferred Swap (CDS).  The goal of a CDS was to generate tax losses, and within

E&Y it was referred to as the "Loss Generator."  CDS was not VIPER's own

serpent's egg--the idea for it seems to have slithered to them from something

called the Private Capital Management Group (PCMG), a group that seems to have

multiplied into many partnerships even before these cases began.  Robert Coplan,

an E&Y executive, described how CDS was supposed to work:

> The client enters into a trading partnership, which invests in swap
> transactions with the economic results being partly contingent on
> movements in either the S&P 500 index or currencies.  In addition the
> partnership engages in a large volume of short term trading activities.
> Accrued payments on the swaps are deducted as ordinary business
> expenses in year one.  If the swap is prematurely terminated after 12

---

[3] VIPER later shed its skin and renamed itself the less acronymically deft Strategic Individual Solutions Group (SISG).

**[*8]** months, in the following year, the gain produced is long-term capital gain.

Between 1999 and 2001 Kalkhoven, Pettit, Esrey, and LeMay--and almost 140 other rich E&Y clients--used CDS, which generated more than $27 million in fees for E&Y.

CDS was complex to implement and paper, and E&Y used PCMG and a firm called Bolton Capital Planning to implement it. In 2000 PCMG stopped working with E&Y and Bolton Capital took over completely. Bolton Capital was owned and run by the next character in our story, one Charles Bolton. Bolton was instrumental in implementing CDS (and later CDS Plus). It was a very lucrative setup for Bolton and he made millions in just a few years. VIPER was by this time bruising the heel of the IRS, and the enmity put between tax collector and tax-shelter promoter made it only a matter of time before the IRS turned to bruising its head. In 2008 Bolton was indicted for conspiracy to defraud the IRS and for making false statements and obstructing the administration of the internal revenue laws, all for his role in promoting CDS and the tag-on to CDS that's at issue in these cases, CDS Plus. The indictment also charged Bolton with making millions on the transactions and using them to lower his own tax bills. He pleaded guilty in 2009. Coplan was convicted of conspiracy to commit tax evasion and making

**[\*9]** false statements to the IRS in connection with CDS Plus. See United States v. Coplan, 703 F.3d 46 (2d Cir. 2012).

There's one final key player in our story. Belle Six started off working in VIPER but moved to PCMG in 1999 to be its liaison with E&Y. When PCMG transferred its part of the CDS business to Bolton Capital, Six became the liaison between Bolton Capital and E&Y. Like Coplan and Bolton, Six didn't escape legal trouble. In 2007 she too was indicted and pleaded guilty to charges of conspiracy to defraud the United States in connection with her role in marketing and promoting the tax shelters offered by E&Y, PCMG, and Bolton Capital. See United States v. Six, no. 1:07 CR 00547 (S.D.N.Y. 2010). She testified against Coplan at his trial.

B.    BCP

    1.    CDS Plus

CDS only converted ordinary income into capital gains and kicked the collection date down the road a year. E&Y clients who bought the deal would still have to pay some tax eventually. E&Y put together CDS Plus to solve this problem, and it's CDS Plus that's at issue in these cases. Since Kalkhoven, Pettit, Esrey, and LeMay had all already used CDS, it wasn't hard for E&Y to get them to tack on CDS Plus. With enormous tax bills looming, the record and stipulations

[*10] show none of them bothered to ask any real questions about what they were dumping their money into. Everyone was focused on the tax benefits CDS Plus promised.

Esrey and LeMay even stipulated that they just participated in CDS Plus to lower their tax bills from exercising their Sprint stock options and unwinding their CDS transactions. There was no realistic possibility of profit. Esrey didn't ask whether CDS Plus could generate any pretax profits, and no one at E&Y brought up the topic. Even though he entrusted a good portion of his money to CDS Plus, LeMay doesn't remember discussing profit potential with anyone at E&Y either. At trial Esrey admitted that CDS Plus was "bogus" and LeMay said it was a fraud. Kalkhoven and Pettit stipulated that E&Y described the tax advantages of buying into CDS Plus, but E&Y didn't mention anything about making an actual profit. Kalkhoven and Pettit didn't think to ask either. E&Y made sure everyone signed nondisclosure agreements so they couldn't discuss CDS Plus with anyone outside E&Y.

2.  Forming BCP

To work, CDS Plus needed a central partnership that everyone could use to artificially inflate his basis and generate tax losses. In May 2000 Bolton Capital formed BCP Trading and Investments, Inc. (BCP). Officially, BCP's business

[*11] purpose was to trade on margins. BCP had 39 members, including Bolton Capital itself. The other 38 client members--all either limited liability companies or limited partnerships--were E&Y clients, and almost all of them had already used CDS transactions.[4]

Bolton Capital was the managing member. The BCP operating agreement was between Bolton Capital and the other client members. Bolton signed the agreement for Bolton Capital. But he also was the managing director or general partner for all the client members so he signed the operating agreement for them too. The operating agreement gave Bolton Capital "all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company * * *." The other client members weren't "permitted to take part in the management or control of the business or affairs of the Company, including, without limitation, voting to remove the Managing Member" and they didn't "have any voice in the management or operation of any Company property."

---

[4] The four client members that did not engage in CDS aren't relevant to these cases.

[*12]  Kalkhoven, Pettit, Esrey, and LeMay all owned a number of the BCP client members, which they used to put CDS Plus into action.  Kalkhoven and Pettit jointly owned:

- Kalkhoven/Pettit Trading Partners (KP1);

- Kalkhoven/Pettit #2 Trading Partners (KP2); and

- PCMG Trading Partners XII (PCMG XII).

Esrey owned:

- William T. Esrey Trading Partners, LP (WTETP); and

- Private Capital Management Group V (PCMG V).

And LeMay owned:

- Ronald T. LeMay Trading Partners, LP (RTLTP); and

- Private Capital Management Group VI (PCMG VI).

Bolton bought into the action too.  In 2001 he bought a 10% interest in PCMG XII and, in 2002 10% interests in both KP1 and KP2.  To summarize, Kalkhoven, Pettit, and Bolton's interests in BCP looked like this:

**[*13]**



[*14] Esrey and LeMay's interests in BCP looked like this:



[*15] 3.     How It Worked

To implement CDS Plus, E&Y had the client members buy nearly offsetting contingent assets and liabilities and contribute them to BCP.  Each client member took a basis in BCP equal to the contingent assets it contributed without reducing its basis by the contingent liabilities.[5]  After the contingency period for the assets and liabilities ended--usually with no economic consequence--a client member would terminate its interest in BCP and receive a distribution with a basis equal to the contingent assets the client member originally contributed.  The idea was to create property with a very high basis relative to its actual value.

a.     Digital Options

The contingent assets and liabilities here were the sort of digital options familiar to connoisseurs of Son-of-BOSS deals.  See, e.g., 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49.  Between July 19 and August 11, 2000, PCMG VI, PCMG XII, WTETP, KP1, and KP2 (and the other client members) entered into European-style digital-option spread trades in foreign currencies with

---

[5] The Code says that a partner's basis in a partnership must equal the basis of the property the partner contributed to the partnership minus any liabilities the partner contributed.  Secs. 722, 752.  (All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.)

[*16] Refco Capital Markets, Ltd. (Refco), and contributed them to BCP.[6]  The options were paired--long options bought by the client members and short options sold to Refco by the client members.[7]  The long options were bought at the same time and for the same currency as the short options but had very small differences in the strike price.  This created a one "pip" spread.[8]  There were 132 option pairs.

Each client member was required to pay Refco for the long options and to be paid by Refco for the short options, but the payments from Refco were always less.  And the payments were netted; Refco just reduced each premium it was entitled to receive by the corresponding premium it had to pay.  Client members paid a total premium (premiums paid by the client members less the premiums Refco owed) of $16.5 million for CDS Plus.

---

[6] There are two basic types of options--American and European.  A European option can be exercised only at maturity.  An American option can be exercised anytime during the life of the option.  A digital option has only two possible outcomes at expiration: some fixed payoff amount or nothing.  Digital options are typically also European-style options, which means that they can be exercised only on the option's expiration date. Markell Co. v. Commissioner, T.C. Memo. 2014-86; 6611, Ltd., at *10 n.4.

[7] One long option and the corresponding short option made up an option pair.

[8] A "pip" stands for "percentage in point" and is the smallest pricing increment used in foreign exchange markets.  For a U.S. dollars/Japanese yen trade, a pip is .01.  If the Japanese yen is trading at 78.41 yen/dollar and weakens by one pip, the new price will be 78.42.

[*17] All the options were digital options. That means that a client member would receive a predetermined payoff on his long option if the currency's spot rate was at or above the option's strike price.[9] But the option would expire worthless if the spot rate was less than the strike price. On his short option, however, a client member would have to pay Refco a predetermined payoff if the currency's spot rate was at or above the option's strike price.

Refco was on the opposite side of these options. It would have to pay on the client's call option if the currency's spot rate was at or above the option's strike price. But it would get paid on the client's put option if the spot rate was at or above the option's strike price. Remember that the clients' long options were always a little more in nominal terms than the short options, and that the strike prices of the two options were very close. This made the two most likely outcomes that both the client's call and Refco's put option would be in the

---

[9] A call option gives the buyer the right to purchase a security (e.g., stock or foreign currency) at a particular price some point in the future. Option buyers pay a premium for that right. If the actual price turns out to be higher than the price where the option was struck (strike price) then the option buyer makes money. If the actual price is lower than the strike price, the call option expires worthless.

A put option is the opposite. It gives the owner the right to *sell* at a particular strike price. A taxpayer would buy a put option if they think the price of a particular currency will go down. When buying a call option, it's common to say you are going long, and when buying a put option it's common to say you are going short.

**[\*18]** money--if so, the client would make some money on the difference; or that both would expire out of the money--if so, Refco got to keep the spread.

Refco was also effectively in charge of the deal--it got to determine the spot price on the expiration date all by itself, albeit "in good faith and in a commercially reasonable manner." For 128 option pairs, the short-option payout was 99.7% of the long-option payout. The options were the only assets the client members contributed to BCP; and on the date they contributed them, each option was "out of the money," meaning that if the prices of the currencies didn't change, the options would expire worthless.

### b.    Creating Tax Losses

The last stage is where using a partnership and the tax rules for partnerships became critical to the scheme and how enormous tax losses magically appeared. The client members all claimed their bases in BCP equaled the values of long option premiums they contributed but without any reduction for the value of the short-option liabilities the partnership assumed on their behalf. E&Y told clients to liquidate their interests in BCP the year they wanted to recognize their tax losses.[10] In exchange for the withdrawing client member's interest, BCP

---

[10] The BCP operating agreement allowed each client member to withdraw from BCP by submitting a written withdrawal request. Each withdrawing client

(continued...)

[*19] distributed Japanese yen and set its basis equal to the basis the client member originally claimed in BCP.

In 2000, 15 client members--including PCMG VI and PCMG XII--withdrew from BCP and received Japanese yen in liquidating distributions. The next year WTETP, KP1, KP2, and the remaining client members withdrew and received Japanese yen. That left BCP without any assets or liabilities, and it went out of existence shortly afterwards, in June 2002.

After they received the yen, client members turned around and sold them at their real value. The long-option premiums that the client members contributed totaled over $3.3 billion, but the total premium they paid Refco was only $16.5 million. The $3.3 billion was the whole point of CDS Plus. The client members used that $3.3 billion--after converting it into Japanese yen--to claim enormous losses. These losses flowed through to the wealthy E&Y clients who actually owned the client members--including Kalkhoven, Pettit, Esrey, and LeMay--who claimed them on their individual tax returns.

This was all done to significantly reduce their tax liabilities. Kalkhoven earned over $500 million in 2000 but paid only $2.7 million in tax because of his

---

[10](...continued)
member was to be paid an amount equal to its book capital account.

[*20] losses from PCMG XII, KP1, and KP2. In 2001 he earned almost $135 million but paid only around $14 million in taxes. Pettit fared pretty well too. In 2000 and 2001 he took home almost $360 million but paid only $5.7 million in tax because of the losses he claimed from PCMG XII, KP1, and KP2. Esrey made almost $289 million in 2000 and 2001; but thanks to more than $500 million in losses from PCMG V and WTETP, he received tax refunds of almost $5.5 million. Not to be outdone, LeMay reported earnings of over $400 million in 2000 and 2001 but got refunds of around $4.6 million.

### 4.     Fees and Lack of Profit Potential

The client members all paid a steep price for these complicated maneuvers. They paid E&Y and Bolton Capital more than $40 million to participate in CDS Plus--more than they realistically could have made. The most all the client members could have collected if every one of the long and short options expired "in the money" was around $34 million--excluding the very small possibility that a long option would expire "in the money" while its short option expired "out of the money" or in the "sweet spot." Coplan told others at E&Y that the transaction fees would be more than any payoff the client members could receive from CDS Plus. Six and Bolton also both admitted later that CDS Plus couldn't make money.

[*21] E&Y based its fees on the amount of losses a client wanted to generate. According to its engagement letter, E&Y charged client members a fee of 0.75% of whatever loss CDS Plus generated. Kalkhoven and Pettit's client members-- KP1, KP2, and PCMG XII--paid almost $19 million in fees to E&Y and Bolton Capital to get in on CDS Plus. Pettit testified that he wasn't concerned about these fees, though. He just wanted E&Y to take care of everything. Esrey's two client members paid over $7.8 million, and LeMay's two paid over $4.2 million to E&Y and Bolton Capital. Client members also paid the net premium to Refco and $75,000 for an opinion letter.

## C. Investigation of E&Y

### 1. Promoter Audit

It didn't take long for the Commissioner to begin looking into E&Y. In March 2002 the IRS began a promoter audit of E&Y for failing to provide information and keep a list of advisees for reportable transactions. In June 2003, the IRS expanded the promoter audit to include promoting abusive tax shelters.[11] The IRS sent E&Y 24 summonses and deposed 7 people during the audit,

---

[11] The expansion also included an audit of E&Y under sections 6694 (understatement of taxpayer's liability by tax return preparer), 6701 (penalties for aiding and abetting understatement of tax liability), 7407 (action to enjoin tax return preparers), and 7408 (actions to enjoin specified conduct related to tax shelters and reportable transactions).

[*22] including Coplan.  The record doesn't contain a great deal of information about the promoter audit, and there's some evidence to suggest that at least some records were destroyed--pursuant to IRS recordkeeping policy--by the time these cases came to trial.  We don't have the final closing agreement between the IRS and E&Y either.  What we do know is that pursuant to summonses, E&Y provided lists of its tax-shelter clients and their transactions to the IRS.  E&Y was concerned about using the word "penalty" in the closing agreement; and it seems that the settlement price was increased so there would be no mention of "penalty" by the time the IRS and E&Y reached a settlement in July 2003.

    2.    <u>Criminal and Senate Investigation</u>

While the IRS was conducting its civil investigation, the New York Times published a scathing article in June 2002 titled "Big Accounting Firm's [E&Y] Tax Plans Help the Wealthy Conceal Income" that predicted E&Y's tax shelters wouldn't stand up to an audit.  It didn't take long for the article to draw the eye of the U.S. attorney's office in Manhattan; and a few days later it called E&Y's general counsel and requested that it keep any documents relevant to the tax shelters in the New York Times article.  E&Y quickly hired a criminal attorney, but between July 2002 and May 2004 there wasn't any contact between the U.S. attorney and E&Y.

**[*23]** In January 2003 the Senate got in on the action too. The Senate Permanent Subcommittee on Investigations told E&Y to give it everything E&Y had on its tax-sheltering activities. In October of that year, an E&Y client who participated in another tax shelter testified before the Senate Committee on Finance. And the next month the Subcommittee heard testimony from representatives of major accounting firms--including E&Y. The Subcommittee later produced a report called "The Role of Professional Firms in the U.S. Tax Shelter Industry."

In May 2004, the U.S. attorney for the Southern District of New York (SDNY) opened a grand-jury investigation into E&Y's sale of tax shelters. That June SDNY met with E&Y's attorney to discuss the investigation. Four former E&Y partners ultimately were indicted, including Coplan. Bolton was added to the list the next year. It was as a result of this criminal investigation that Bolton, Six, and Coplan were all either convicted or pleaded guilty for their roles in promoting CDS Plus.

The prosecutors asked E&Y to voluntarily provide information to help in the investigation. But in July the grand jury issued its first subpoena to E&Y. That same month E&Y wrote to Kalkhoven, Pettit, Esrey, and LeMay; told them about the criminal investigation; and moved their representation to Fulbright &

[*24] Jaworski. E&Y itself was never indicted and finally wrapped up the problem when it signed a nonprosecution agreement.

But that was just the U.S. attorney's office--not the IRS. In July 2002 the IRS told E&Y that it had not made a criminal referral. The next day, SDNY told the attorney representing E&Y in the criminal case that the IRS had decided not to open an investigation into criminal charges. But in May and June 2003 the IRS civil team working on the promoter audit met several times with the IRS Criminal Investigation Division (CID). The civil-audit team learned then that CID was investigating several E&Y partners for selling tax shelters, but those partners were never actually indicted. In June 2003 the IRS told E&Y's attorney that CID still wasn't investigating E&Y, although there's some evidence suggesting that the civil team and CID shared information. In February 2004 CID issued a summons to Coplan, but that was something of a red herring--CID was looking into another E&Y partner who was selling another type of tax shelter--not CDS or CDS Plus.

### 3. CDS and BCP Investigation

Within this swirl of investigations, we have to focus on the one that aimed at BCP. The parties agree that by 2002 E&Y was aware that the IRS was auditing CDS. E&Y formed an internal task force to deal with the audit but hired Skadden Arps to help out in June 2003. The parties stipulated that no one on the IRS CDS

[*25] audit team knew anything about a potential criminal investigation until May 2004. And no one on the team knew that the criminal investigation implicated any E&Y partners involved in CDS or CDS Plus until indictments were announced in May 2007. Even before then, in 2006, the IRS made a global settlement offer for CDS transactions.

4. Extending the Statute of Limitations

All these investigations took a long time, and the IRS wanted to keep the statute of limitations open for BCP's 2000 and 2001 tax years. So the IRS asked Bolton Capital to extend the statute. BCP and its client members were willing to do so. In November and December 2003, Six told Kalkhoven, Pettit, Esrey, and LeMay that Bolton Capital planned to extend the statute of limitations at the partnership level unless she heard otherwise from them, and that E&Y itself recommended Bolton Capital sign the extensions. When no one objected, Bolton signed the extensions.[12] The extensions were on Forms 872-P, Consent to Extend

---

[12] Bolton signed the extension in his capacity as managing direct of Bolton Capital, tax matters partner of KP1, which was the tax matters partner for BCP. Under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, any "partnership," including all the partnerships that brought these cases, must designate one of its partners as the tax matters partner (TMP) to handle its administrative issues with the Commissioner and manage any resulting litigation. Sec. 6231(a)(7).

[*26] the Time to Assess Tax Attributable to Partnership Items. This extended the period the IRS could assess "any federal income tax attributable to the partnership items of [BCP] against any partner of the partnership." PCMG VI, PCMG XII, WTETP, KP1, and KP2 were all partners of the partnership. Over the next several years, Bolton signed a number of extensions. For BCP's 2000 tax year, he signed extensions on:

| Date extension signed by Bolton | Date extension signed by IRS | Date extension expired |
| --- | --- | --- |
| January 6, 2004 | January 13, 2004 | April 15, 2005 |
| November 30, 2004 | December 7, 2004 | April 15, 2006 |
| October 3, 2005 | October 18, 2005 | December 31, 2006 |
| September 8, 2006 | October 3, 2006 | December 31, 2007 |
| April 2, 2007 | April 6, 2007 | June 30, 2008 |

And for BCP's 2001 tax years, Bolton signed Forms 872-P on:

| Date extension signed by Bolton | Date extension signed by IRS | Date extension expired |
| --- | --- | --- |
| November 1, 2004 | November 9, 2004 | April 15, 2006 |
| October 3, 2005 | October 18, 2005 | December 31, 2006 |
| September 8, 2006 | October 3, 2006 | December 31, 2007 |
| April 2, 2007 | April 6, 2007 | June 30, 2008 |

**[\*27]** These extensions ultimately kept the statute of limitations open for BCP and its client members through June 2008 for the both the 2000 and 2001 tax years.

Bolton and Six knew about their own potential liability as promoters of CDS Plus and other E&Y tax shelters when they signed these extensions. The parties stipulated that by at least May 2003 both Bolton and Six knew about the investigation of E&Y's tax shelters although it wasn't until May or July of 2006-- after Bolton signed all but two pairs of extensions--that Bolton and Six became concerned about their personal liability and hired counsel.

Bolton wasn't the only one who signed extensions though. Kalkhoven, Pettit, Esrey, and LeMay all signed a different version of Form 872, numbered 872-I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership. These Forms 872-I extended the time for assessing tax on "any return(s) made by or for" Kalkhoven, Pettit, Esrey, and LeMay. It also extended the time for assessing any tax attributable to any partnership items, affected items, computational adjustments, and partnership items converted to nonpartnership items.

Beginning in November 2003, Kalkhoven and Pettit each signed nine pairs of extensions to keep their 1999-2004 tax years open through the end of 2012. They signed the last extensions in August 2011.

[*28]

| Tax years covered | Date extension signed by Kalkhoven/Pettit | Date extension signed by IRS | Date extension expired |
|---|---|---|---|
| 2000 | November 17/20, 2003 | December 12, 2003 | December 31, 2004 |
| 2000 | September 27, 2004 | October 4, 2004 | December 31, 2005 |
| 1999-2001 | May/June 2005 | June 15, 2005 | June 30, 2006 |
| 1999-2002 | January/ February 2006 | February/March 2006 | June 30, 2007 |
| 1999-2003 | December 2006/ January 2007 | January 16, 2007 | June 30, 2008 |
| 1999-2004 | February 6/8, 2008 | February 12, 2008 | June 30, 2009 |
| 1999-2004 | November/ December 2008 | December 18, 2008 | June 30, 2010 |
| 1999-2004 | February 1/17, 2010 | February 19, 2010 | December 31, 2011 |
| 1999-2004 | August 17/29, 2011 | September 7, 2011 | December 31, 2012 |

LeMay signed five Forms 872-I:

| Tax years covered | Date extension signed by LeMay | Date extension signed by IRS | Date extension expired |
|---|---|---|---|
| 2000 | January 26, 2004 | February 9, 2004 | December 31, 2004 |
| 1999-2000 | August 16, 2004 | August 26, 2004 | December 31, 2005 |
| 1999-2002 | July 25, 2005 | August 1, 2005 | December 31, 2006 |
| 1999-2003 | September 9, 2006 | September 21, 2006 | December 31, 2008 |
| 1999-2004 | October 1, 2007 | November 5, 2007 | 90 days after consent revoked |

[*29] Esrey signed the most extensions and kept his 1999-2003 tax years open through June 2013.

| Tax years covered | Date extension signed by Esrey | Date extension signed by IRS | Date extension expired |
|---|---|---|---|
| 2000 | December 4, 2003 | December 9, 2003 | December 31, 2004 |
| 2000 | August 10, 2004 | August 23, 2004 | December 31, 2005 |
| 2001 | December 9, 2004 | December 20, 2004 | December 31, 2005 |
| 1999-2002 | July 3, 3005 | July 11, 2005 | December 31, 2006 |
| 1999-2003 | August 21, 2006 | August 23, 2006 | December 31, 2007 |
| 1999-2003 | July 10, 2007 | July 13, 2007 | December 31, 2008 |
| 1999-2003 | May 8, 2008 | May 27, 2008 | June 30, 2009 |
| 1999-2003 | February 8, 2009 | March 9, 2009 | December 31, 2009 |
| 1999-2003 | July 15, 2009 | August 12, 2009 | June 30, 2010 |
| 1999-2003 | February 8, 2010 | February 19, 2010 | June 30, 3011 |
| 1999-2003 | December 15, 2010 | January 6, 2011 | June 30, 2012 |
| 1999-2003 | December 19, 2011 | January 9, 2012 | June 30, 2013 |

Kalkhoven and Pettit weren't ignorant of the E&Y investigations when they signed their extensions. Even when they signed the first extensions in November 2003, and they were still represented before the IRS by E&Y they knew something was wrong with their E&Y tax strategies. Back in 2002, E&Y told them it was turning over documents to the IRS pursuant to summonses related to "certain transactions in which you were involved." E&Y also told them to contact McKee

[*30] Nelson LLP, the outside law firm E&Y engaged to assist it in the matter, if either of them had any questions. (There was also the New York Times article published in June 2002.) By September 2004, Kalkhoven and Pettit hired Fulbright & Jaworski and Vinson & Elkins to represent them before the IRS. Kalkhoven and Pettit continued to sign extensions for years while they were represented by Fulbright & Jaworski and Vinson & Elkins.

Esrey and LeMay also had reason to question E&Y and its tax strategies when they started signing extensions. In the fall of 2000, Esrey and LeMay brought in King & Spalding to look at CDS and CDS Plus. King & Spalding raised concerns about whether the transactions were valid. In February 2002 Esrey and LeMay sent a letter to E&Y telling it King & Spalding would be looking over E&Y's shoulder and would be providing independent legal advice about an IRS audit of PCMG VI, as well as any future audits. They wanted King & Spalding to be their liaison with E&Y.[13] They also told E&Y to give King & Spalding all relevant documents and to consult with King & Spalding about strategic matters regarding audits and possible litigation. E&Y was told to hold update meetings at least quarterly with King & Spalding as well. In May 2004

---

[13] They told E&Y they expected it to continue to handle these audits on a day-to-day basis though. In July and August 2002, Esrey and LeMay each signed powers of attorney for E&Y to represent them before the IRS.

**[\*31]** Esrey hired Baker & McKenzie and LeMay hired Arnstein & Lehr to represent them before the IRS. LeMay knew that E&Y was under investigation no later than the summer of 2003 when a New York Times reporter called him with questions about the E&Y investigation.

D.   FPAAs

In January 2008, the Commissioner finished his audit of BCP under TEFRA and issued notices of final partnership administrative adjustment (FPAAs) for 2000 and 2001.[14] He determined in those FPAAs that BCP was a sham formed

_____

[14] Part of TEFRA governs the tax treatment and audit procedures for most partnerships. See TEFRA, Pub. L. No. 97-248, secs. 401-406, 96 Stat. at 648-71. TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. TEFRA requires the uniform treatment of all "partnership item[s]"--a term defined by section 6231(a)(3) and (4), and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership-item adjustments on each partner's individual return. See H.R. Conf. Rept. No. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63. If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing an FPAA. Sec. 6223(a). An FPAA generally includes: (1) a notice of final partnership administrative adjustment, (2) Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, including a Schedule of Adjustments, and (3) an "Exhibit A--Explanation of Items," listing the Commissioner's other adjustments or determinations.

Bolton Capital didn't make a capital contribution and didn't have a profits interest in BCP, it couldn't be the TMP. See sec. 301.6231(a)(7)-1(b), Proced. & Admin. Regs. So KP1 replaced Bolton Capital as the TMP on March 26, 2004. And the Commissioner mailed the FPAAs to KP1 because it was BCP's tax matters partner at the time.

[*32] "solely for purposes of tax avoidance by artificially overstating basis in the partnership interest of its purported partners" and that it didn't have a profit motive. He therefore determined to disregard BCP for tax purposes and eliminate the $14,136,000 loss BCP claimed for 2000 and the $56,700 loss it claimed for 2001.[15] WTETP, one of the notice partners, filed two petitions in Tax Court, one for each year.[16] KP1 intervened as the TMP. PCMG VI, KP2, and PCMG XII all joined as participants.[17]

There are three remaining issues that we must decide. We will address them in the following order:

- our jurisdiction;

- the validity of the statute-of-limitations extensions; and

---

[15] The Commissioner initially imposed accuracy-related penalties, but he decided later that the penalties don't apply because the client members in these cases disclosed their participation in CDS Plus.

[16] Section 6231(a)(8) generally defines a notice partner as a "partner" who is "entitled to notice" of an administrative proceeding under section 6223(a), which includes any partner in a partnership with 100 or fewer partners.

[17] The partners are divided into two camps. The first camp is Kalkhoven and Pettit through their client members (KP1, KP2, and PCMG XII), and the second is Esrey and LeMay through their client members (WTETP and PCMG VI).

These cases are appealable to the D.C. Circuit because BCP didn't exist when the petition was filed and the parties haven't stipulated otherwise. See sec. 7482(b)(1) (flush language).

[*33] • whether BCP was a sham partnership.

OPINION

I. Jurisdiction

Partnerships do not pay income tax, but they do file informational returns that their partners then use to calculate their own individual tax liability. See secs. 701, 6031, 6222(a). TEFRA deals with partnership tax matters in two stages. United States v. Woods, 571 U.S. __, __, 134 S. Ct. 557, 563 (2013). In the first the Commissioner tries to adjust "partnership items" at the partnership level. Id.; see secs. 6221, 6231(a)(3). After the partnership adjustments are final, the Commissioner then may start proceedings at the partner level to make "computational adjustments" to the individual partner's tax liability. Sec. 6231(a)(6); Woods, 571 U.S. at __, 134 S. Ct. at 563.

BCP was subject to audit under TEFRA, so our jurisdiction at the partnership level is limited to

> *partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates*, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

Sec. 6226(f) (emphasis added).

So what are partnership items? Section 6231(a)(3) says that:

**[\*34]**     [t]he term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

The Secretary has told us what he's determined to be partnership items in section 301.6231(a)(3)-1, Proced. & Admin. Regs. Once a petition is filed, we have jurisdiction to determine partnership items. See, e.g., Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 95 (2012), aff'd in part, rev'd in part, and remanded sub nom. Logan Tr. v. Commissioner, 616 F. App'x 426 (D.C. Cir. 2015). We also have jurisdiction to determine "the proper allocation of [these] * * * items among the partners and the applicability of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item." Id.; see also Woods, 571 U.S. at __, 134 S. Ct. at 564. This latter jurisdiction isn't unlimited, however, and we have gone to great pains to determine its boundaries. See, e.g., Tigers Eye, 138 T.C. at 95-143; Petaluma FX Partners, LLC v. Commissioner, T.C. Memo. 2012-142, rev'd and remanded, 792 F.3d 72 (D.C. Cir. 2015).

A nonpartnership item is an item which is (or is treated as) not a partnership item. Sec. 6231(a)(4). And an affected item is a nonpartnership item that is affected by the determination of a partnership item. See sec. 6231(a)(5); Ginsburg

[*35] v. Commissioner, 127 T.C. 75, 79 (2006).  As it does for other nonpartnership items, the Code tells us that we can determine affected items (with the exception of certain penalties) only at the individual level and not in a partnership-level proceeding.  The Supreme Court has told us that determining a partner's outside basis is a nonpartnership item.  Woods, 571 U.S. at __, 134 S. Ct. at 564; see Petaluma FX Partners, LLC v. Commissioner, 591 F.3d 649, 654-55 (D.C. Cir. 2010), aff'g in part, rev'g in part, vacating and remanding in part 131 T.C. 84 (2008).  Because these cases are appealable in the D.C. Circuit, we must follow that court's precedent.  See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

Kalkhoven and Pettit make several jurisdictional arguments that we must address.  They first claim that we don't have jurisdiction to sham BCP because our jurisdiction to do so would be under section 301.6233-1T(c), Proced. & Admin. Regs., 52 Fed. Reg. 6795 (Mar. 5, 1987), which is (they allege) procedurally invalid because it didn't go through notice and comment.  That's simply not true. The validity of a partnership is a partnership item under Woods.  See Woods, 571 U.S. at __, 134 S. Ct. at 563; Tigers Eye, 138 T.C. at 99; see also Petaluma FX Partners, 591 F.3d at 653.  This partnership-level determination is what the partner-level computational adjustments are based on in later proceedings.  Tigers

[*36] <u>Eye</u>, 138 T.C. at 99. The question is just like any other determination of a partnership item's amount or characterization. <u>Woods</u>, 571 U.S. at __, 134 S. Ct. at 563; <u>Petaluma FX Partners</u>, 591 F.3d at 653. If we find that an entity that filed a partnership return is a sham, there can't be any partnership income, gain, or loss because these items cannot properly be characterized as belonging to a partnership. <u>Tigers Eye</u>, 138 T.C. at 99.

Kalkhoven and Pettit try to severely narrow what we can look at when we determine whether BCP was a sham. They claim we don't have jurisdiction to look at anything that happened above BCP (i.e., that we can't look at what the client members did). Under their argument, we can't look at the client members' purchase of the option pairs, whether there was profit motive, or whether the client members acted in concert. These are all key pieces to the Commissioner's argument that BCP was a sham. (And we note that Esrey and LeMay don't bother to make these arguments). We don't have to turn a blind eye to any fact that isn't strictly a partnership item. We have consistently evaluated whether parties had a profit motive and looked at their actions in cases like this. <u>See, e.g.</u>, <u>436, Ltd. v Commissioner</u>, T.C. Memo. 2015-28; <u>Markell Co. v. Commissioner</u>, T.C. Memo. 2014-86; <u>see also</u> <u>Woods</u>, 571 U.S. at __, 134 S. Ct. at 563-64. We may consider the facts in the record when we make partnership-level determinations. <u>See</u>

[*37] <u>Petaluma FX Partners</u>, 591 F.3d at 653; sec. 301.6231(a)(3)-1(a) and (b), Proced. & Admin. Regs.

Kalkhoven and Pettit's last jurisdictional argument is that we aren't allowed to determine outside basis. They're right. Originally, the Commissioner disallowed the outside basis each of the client members claimed in BCP. But the Commissioner now correctly concedes we don't have jurisdiction over partners' outside bases under <u>Woods</u>.

II.    <u>Statute of Limitations</u>

We now turn to the statute-of-limitations issue. A partnership is required to file a return by the fifteenth day of the fourth month (generally April 15) after the end of the taxable year of the partnership. Sec. 6031; sec. 1.6031(a)-1(e)(2), Income Tax Regs. The Commissioner then has three years to assess income tax attributable to partnership items. Sec. 6229(a). The clock starts either on the date (1) the partnership return is filed or (2) the last day for filing the return (again, usually April 15), whichever is later. <u>Id.</u> BCP filed its 2000 tax return in March 2001 and its 2001 tax return in April 2002. That means that under the general rules the Commissioner had to issue the 2000 FPAA by April 16, 2004; and the

[*38] 2001 FPAA by April 15, 2005.[18] Id. The FPAAs weren't issued until January 31, 2008.

But there are two ways to extend the three-year window. The first is for the Commissioner to get permission from the partner whose return would be affected. Id. subsec. (b)(1)(A). Or if the Commissioner wants to deal with a question that affects the partnership itself, he may ask the TMP to sign an agreement extending the period for all the partners. Id. subpara. (B); Transpac Drilling Venture 1982-12 v. Commissioner, 147 F.3d 221, 224 (2d Cir. 1998), rev'g T.C. Memo. 1994-26. Both types of agreements must be signed before the original three-year statute of limitations runs out. Sec. 6229(b)(1). The statute of limitations is an affirmative defense, so taxpayers start with the burden of proof. Rule 142(a); Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240 (1990); Adler v. Commissioner, 85 T.C. 535, 540 (1985).

A.    BCP Extensions

The Commissioner got extensions from the TMP (through Bolton) and from Kalkhoven, Pettit, Esrey, and LeMay. The Forms 872-P that Bolton signed

_____

[18] BCP filed its 2000 return early. The time for assessing income tax for BCP's 2000 tax return didn't expire until April 16, 2004. See sec. 6229; Marcy v. Commissioner, T.C. Memo. 2008-166, 2008 WL 2651162, at *1 (noting that April 15, 2001, was a Sunday and that the filing date and period of limitation was pushed back by one day); sec. 1.6031(a)-1(e)(2), Income Tax Regs.

[*39] extended the statute of limitations for "assess[ing] any federal income tax attributable to the partnership items of [BCP] against any partner of the partnership."[19] That means that PCMG VI, PCMG XII, WTETP, KP1, and KP2 are on the hook for BCP if the extensions were valid and the Commissioner would win. Bolton signed the first extension on January 6, 2004, but that extension kept the period open only for the 2000 tax year. Over the next several years, however, Bolton signed eight more Forms 872-P and ultimately kept the statute of limitations open until June 30, 2008. So the Commissioner wasn't barred from issuing the FPAAs in January 2008 unless the extensions weren't valid.

All the partners here now claim that the first Form 872-P for tax year 2000 that Bolton signed back in January 2004 wasn't valid. They argue Bolton signed it at the direction of E&Y, which was under a disabling conflict of interest because it was being investigated by the IRS and the USAO.[20] They also argue that E&Y obtained consent through misrepresentation and undue influence, and they claim

---

[19] Bolton signed these consents in his capacity as the managing director of Bolton Capital, which was the TMP for KP1, the TMP for BCP.

[20] The partners do not address the validity of the many other extensions Bolton signed--other than to argue that they were signed after the statute of limitations had closed because the first extension Bolton signed, in their view, was invalid--so we deem those conceded. See Rule 151(e); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Tufft v. Commissioner, T.C. Memo. 2009-59, 2009 WL 722051, at *6.

[*40] that E&Y controlled Bolton by "embedding" Six--a former E&Y employee-- inside Bolton Capital, where she got Bolton to defer to her and E&Y's instructions when he signed the initial consent. The partners finish by saying the Commissioner knew of the disabling conflict when he got E&Y to get consent. Essentially, the partners try to conflate the roles played by E&Y and Bolton.

They build their argument on Transpac, 147 F.3d 221. In Transpac, the Commissioner first tried to get consents from the partners to extend the statute of limitations, but most of them said no. Id. at 224. Knowing the partners didn't want to extend the statute of limitations, the Commissioner turned to the TMPs, whom he knew were under criminal investigation. The TMPs were, unsurprisingly, more receptive to the Commissioner's request. Id. They had "a powerful incentive to ingratiate themselves to the government," and worked with the IRS in a criminal prosecution of the Transpac promoter because their immunity or suspended sentence depended on it. Id. at 223, 227. The TMPs signed the extensions right about the time they were especially trying to coax the government into granting them immunity or agreeing to lighter sentences. Id. at 223-24.

The Second Circuit held that the Commissioner couldn't use these consents to bind the partners because he knew the TMPs had a strong incentive to cooperate with the government and had conflicting interests with the partners. Id. at 227.

**[\*41]** The Court was particularly concerned that the Commissioner knew that the partners didn't want to extend the statute of limitations, but got the extensions from the TMPs anyway. Id.

This issue is very fact dependent, Madison Recycling Assocs. v. Commissioner, 295 F.3d 280, 289 (2d Cir. 2002), aff'g T.C. Memo. 2001-85, and Transpac is distinguishable from these cases in several ways. Unlike in Transpac, the Commissioner here was not originally turned down by the client members or by Kalkhoven, Pettit, Esrey, and LeMay before he turned to Bolton. Kalkhoven, Pettit, Esrey, and LeMay in fact all signed many extensions themselves. Six told Kalkhoven, Pettit, Esrey, and LeMay that BCP planned to extend the statute of limitations unless she heard otherwise from them. No one objected. The Second Circuit's primary concern in Transpac was that the Commissioner knew the individual partners didn't want extensions but got them anyway from the TMPs isn't present here.

The TMPs in Transpac were also *already* under criminal investigation, and they knew it. Here the parties agree that Bolton didn't become concerned about personal criminal liability until sometime in the summer of 2006--after he signed all but two of the extensions. Even then, Bolton didn't cooperate with the government by testifying in Coplan's case. And he didn't get immunity or a

**[*42]** suspended sentence like the TMPs in <u>Transpac</u>--he was indicted and pleaded guilty in 2009.

We find that E&Y, which was cooperating with the government, did not bind BCP. It was Bolton who did. BCP tries to link the two by arguing that E&Y "embedded" Six in BCP. But Six testified in another case that she left E&Y for messy personal reasons. We will not allow the partners to now claim the extensions are not valid when they were given ample opportunity to object in the first place but chose not to. <u>See, e.g.</u>, <u>Phillips v. Commissioner</u>, 114 T.C. 115 (2000) (existence of criminal investigation alone doesn't undermine a TMP's judgment), <u>aff'd</u>, 272 F.3d 1172 (9th Cir. 2002); <u>Madison Recycling Assocs. v. Commissioner</u>, T.C. Memo. 2001-85, <u>aff'd</u>, 295 F.3d 208 (2d Cir. 2002). <u>Transpac</u> is also distinguishable because it dealt with a situation where the taxpayers themselves didn't sign consents. In contrast all four taxpayers here signed separate consents. <u>See, e.g.</u>, <u>Twenty-Two Strategic Inv. Funds v. United States</u>, 859 F.3d 684 (9th Cir. 2017).

We turn next to the argument that the extensions were a result of E&Y's misrepresentation and undue influence and that E&Y breached its fiduciary duty to disclose these disabling conflicts of interest. The partners base these arguments on the idea that statute extensions should be treated like contracts. But an

**[\*43]** agreement to extend the statute of limitations for collecting taxes is not a contract; it's the waiver of a defense. Stange v. United States, 282 U.S. 270, 276 (1931); Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983); Tallal v. Commissioner, 77 T.C. 1291, 1294 (1981). Contract principles are important, though, to determine whether the waiver is valid. See Schulman v. Commissioner, 93 T.C. 623, 639 (1989); Piarulle, 80 T.C. at 1042. But using the partners' contractual analysis doesn't invalidate these extensions. Undue influence is unfair persuasion by a person who dominates a party or when, because of their relationship, a party justifiably assumes the person won't do anything against his welfare. Chai v. Commissioner, T.C. Memo 2011-273, 2011 WL 5600287, at \*2; see also 1 Restatement, Contracts 2d, sec. 177(1) (1981).

The problem with this argument is that E&Y wasn't Kalkhoven, Pettit, Esrey, or LeMay's only adviser and they all had ample reason to question E&Y long before 2004. In 2000--long before Bolton signed the 2004 extension--Esrey and LeMay hired King & Spalding to look into CDS Plus. It was then that King & Spalding questioned whether CDS Plus could get through an audit. In 2002 Esrey and LeMay informed E&Y that King & Spalding would be looking over E&Y's shoulder and providing its own legal advice. They told E&Y to give King &

[*44] Spalding any relevant documents and consult it about any strategic matters regarding the audits.

LeMay even received a call from a reporter at the New York Times asking him about the E&Y investigation in 2003. Given their close relationship, we find it more likely than not that he told Esrey about the call. In May 2004 Esrey hired Baker & McKenzie and LeMay hired Arnstein & Lehr to represent them before the IRS. These facts lead us to find that Esrey and LeMay understood far more than they let on and undercut their claim that they blindly relied on E&Y.

As for Kalkhoven and Pettit, E&Y told them in May 2002 that it was giving the IRS documents related to "certain transactions in which you were involved." E&Y told them to speak with McKee Nelson if they had concerns. Kalkhoven and Pettit hired Fulbright & Jaworski and Vinson & Elkins in September 2004 to represent them before the IRS. With these law firms representing them, Kalkhoven and Pettit didn't object to Bolton's continuing to sign extensions through April 2007. Given these facts, we cannot believe that E&Y manipulated Bolton into signing the 2004 Form 872-P and hid its intent from Kalkhoven, Pettit, Esrey, and LeMay as they claim.

[*45] B.     Individual Partner Extensions

This all would be enough for us to find that the statute of limitations was still open when the Commissioner sent the FPAAs in 2008, but we will also address the extensions that Kalkhoven, Pettit, Esrey, and LeMay signed. We'll start with Esrey and LeMay. They repeat their arguments for why the partnership-level extension wasn't valid--the IRS knew E&Y had a conflict and E&Y induced them to sign through undue influence and misrepresentation. But they make this argument only for the extension Esrey signed in December 2003 and the one LeMay signed in January 2004. This argument doesn't work for the same reason it didn't work for the partnership-level extension. We've already said undue influence requires unfair persuasion by a person who dominates a party or when, because of their relationship, a party justifiably assumes the person won't do anything against his welfare. See Chai v. Commissioner, 2011 WL 5600287, at *2. E&Y didn't control Esrey and LeMay. They had E&Y report to King & Spalding, and King & Spalding provide them with independent legal advice. Both knew that prosecutors were investigating E&Y because E&Y told them so. Both were also sophisticated businessmen who were represented by sophisticated law firms. And yet they continued to sign extensions while being represented by Baker & McKenzie and Arnstein & Lehr.

**[\*46]**  That leaves Kalkhoven and Pettit.  They also argue that E&Y failed to disclose all the facts before they signed their extensions.  They focus their argument on the extensions each signed in November 2003 and September 2004. The Commissioner responds that the November 2003 extensions are valid but irrelevant, because Kalkhoven and Pettit didn't file their 2000 tax return until October 2001.  That means the three-year period hadn't expired when they signed the second set of extensions in September 2004.  It's these extensions that the Commissioner focuses on.

Kalkhoven and Pettit stipulated that they were represented before the IRS by Fulbright & Jaworski and Vinson & Elkins by September 2004.  When they signed the 2004 extensions, Kalkhoven and Pettit knew about E&Y's conflicts-- that's why E&Y had shuffled them over to Fulbright & Jaworski.  And E&Y had already told Kalkhoven and Pettit back in August 2002 that it was subject to a promoter audit for CDS.  It told them--as it had Esrey and LeMay--to contact McKee Nelson if they had any questions.  Again, we can't find that Kalkhoven and Pettit were misled by E&Y under these circumstances.  And as Kalkhoven, Pettit, Esrey, and LeMay don't argue that the remaining extensions are invalid, we deem them valid as well.  See Rule 151(e); Petzoldt, 92 T.C. at 683; Tufft, T.C. Memo. 2009-59.

[*47] III.     Son-of-BOSS Deal

After working through these jurisdictional and statute-of-limitations arguments, we arrive at the now-familiar scene of a Son-of-BOSS tax shelter. Esrey and LeMay don't argue with the Commissioner that BCP was a sham or that this deal doesn't work, but Kalkhoven and Pettit insist that BCP's status as a partnership must be respected.

While there are different varieties of Son-of-BOSS deals, what they have in common is the transfer of assets encumbered by significant liabilities to a partnership with the goal of inflating basis in that partnership. See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007). The liabilities are usually obligations to buy securities, and they always include at least one that seems contingent at the time of transfer. Taxpayers who engage in these deals claim that this allows the partner to ignore those liabilities in computing basis, which allows the partnership to ignore them in computing basis. The result is that the partners will have bases in the partnership high enough to provide for large noneconomic losses on their individual tax returns.

In these cases BCP was at the center of everything. Bolton Capital formed it and sent over to it 38 client members who contributed more than $3.3 billion in long options. When the client members contributed the options, they claimed to

[*48] have bought partnership interests, and calculated their bases in BCP without taking into account the contingent liabilities they also contributed. See sec. 752. This step is of extreme importance in Son-of-BOSS deals--a partner who gets his partnership to assume a liability has to reduce his basis in the partnership by the amount of that liability. See id. subsec. (b). Doing so would, however, defeat the goal of inflating basis to create a giant artificial loss.

So when Kalkhoven and Pettit did this through their client members, they were setting up their argument that their client members' outside bases in BCP were only their bases in the long options. BCP then bought Japanese yen and distributed them to the client members in liquidation of their partnership interests. Under section 732 the client members' supposed outside bases became bases in the distributed yen, which they then sold. But rather than calculate their gain or loss by subtracting the actual purchase price of the options from the actual sale price, they claimed that they could subtract the pretend bases for those options from the actual sale price. Thus, at the end of the paper shuffle, Kalkhoven and Pettit claimed losses just shy of $1 billion in 2000 and 2001 from the sale of the yen--an amount sufficient to almost offset their enormous incomes from those years.

**[*49]** A. BCP as a Partnership

For this deal to work, it's essential that BCP have been a valid partnership because it is only partnership-basis rules that seem to lend themselves to this kind of chicanery. We begin our analysis as we usually do: Federal law controls the classification of an entity for federal tax purposes, Luna v. Commissioner, 42 T.C. 1067, 1077 (1964), so we must first determine whether BCP--organized as an LLC--was in fact a *bona fide* partnership under the Code, see Markell, at *17.

The term "partnership" is defined as a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on. Secs. 761, 7701(a)(2). Mere co-ownership is not by itself enough. See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. Instead, we look to several factors:

(1) the contributions, if any, which each party has made to the venture;

(2) the agreement of the parties and their conduct in executing its terms;

(3) whether business was conducted in the joint names of the parties;

(4) whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income (not a relevant distinction in these cases);

**[*50]** (5)    whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise;

(6)    the parties' control over income and capital and the right of each to make withdrawals;

(7)    whether separate books of account were maintained for the venture; and

(8)    whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers.

Luna, 42 T.C. at 1077-78; see TIFD III-E, Inc. v. United States, 459 F.3d 220, 231-32 (2d Cir. 2006).  As with any such prongified area of law, these factors make sense only if they help us answer a common underlying question.  That question here is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise.  Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Commissioner v. Tower, 327 U.S. 280, 286-87 (1946); Historic Boardwalk Hall, LLC v. Commissioner, 694 F.3d 425, 449 (3d Cir. 2012), rev'g and remanding 136 T.C. 1 (2011); Southgate Master Fund, L.L.C. ex. rel. Montgomery Capital Advisors v. United States, 659 F.3d 466, 488 (5th Cir. 2011); TIFD, 459 F.3d at 230; Jimastowlo Oil, LLC v. Commissioner, T.C. Memo. 2013-195.[21]  We will examine each of the applicable factors.

---

[21] As we noted in Markell, at *20 n.13, this type of entity-focused and

(continued...)

[*51] *Parties' Contribution to the Venture*. BCP was established on May 19, 2000, and between July 31 and August 11, 2000, the 38 client members contributed the 132 paired-option bundles to BCP as their capital contributions. This factor weighs in favor of finding a partnership.

*Parties' Agreement and Whether Business Was Conducted in a Joint Name*. There was a formal operating agreement, but all the actual activity was shunted through a single conduit: Bolton, the managing director of Bolton Capital. The only "business" that BCP conducted was the sale of the option pairs used to buy $2,296,000 worth of Japanese yen from Refco which it quickly distributed to the client members in liquidation of their partnership interests--generating enormous tax losses for the client members to pass up to their owners.

Under any definition, "business" means a "course of activities engaged in for profit." Brook, Inc. v. Commissioner, 799 F.2d 833, 839 n.7 (2d Cir. 1986), aff'g T.C. Memo. 1985-462 and T.C. Memo. 1985-614; Lamont v. Commissioner, 339 F.2d 377, 380 (2d Cir. 1964) (quoting 4 Mertens Law of Federal Income Taxation, sec. 25.08 (1960)). The phrase "course of activities" implies more than a single transaction; it implies routine, or a series of transactions. Here, there was

---

[21](...continued)
intent-seeking approach to determining the existence of a partnership applies broadly--not just to partnerships engaged in dubious digital-option deals.

[*52] no "business" to conduct, just a single transaction, and even it wasn't in joint name.  These factors weigh very heavily against finding a partnership.

*Principal v. Employee and Lack of Mutual Control.*  KP1, KP2, and PCMG XII may have had interests in BCP, but it was Bolton (through Bolton Capital) who exercised all the power under the operating agreement.  The agreement is clear:  Bolton Capital had "all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company."  None of the client members could have operated the alleged partnership.  The client members were not "permitted to take part in the management or control of the business or affairs of the Company, including, without limitation, voting to remove the Managing Member" or "have any voice in the management or operation of any Company property."  On top of all this, Bolton was the managing director for all the client members, and he was the one who signed the operating agreement on behalf of each client member.  It's Bolton's--and only Bolton's--signature that is on the operating agreement almost forty times.  There was no mutual control; there was only one-man control.  This weighs against finding a partnership.

*Parties' Control Over Income and Capital and Right to Withdraw.*  The parties didn't have control over income--there wasn't any real profit.  The

[*53] operating agreement did allow the client members to withdraw by submitting a written request, but E&Y told the client members when to withdraw. They did get an amount equal to their book capital account when they withdrew. At best these factors are neutral.

*Whether Business Was Conducted in Joint Name.* BCP's books do seem to have been kept separate from other ventures, and BCP did file partnership Forms 1065, U.S. Return of Partnership Income, for its 2000 and 2001 tax years. Both were prepared by E&Y. BCP also issued Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., to the client members. The returns show that BCP held itself out as a federally recognized partnership. This factor does weigh in favor of finding a partnership.

But this entire multifactor test turns on the fair and objective characterization of all the circumstances. What we find is a scrupulous adherence to the formal requirements of making BCP look like a partnership, but a complete absence in its operating agreement and actual operations of any objective indication of a mutual combination for the present conduct of an ongoing enterprise. We therefore find that the client members did not intend to "join together" to undertake business under BCP, and that they were not partners in this purported partnership.

**[*54]** B. The Business of Tax Savings

There is a second and separate hurdle to any finding that BCP was a partnership: A partnership must conduct some kind of business activity. See Culbertson, 337 U.S. at 742; Torres v. Commissioner, 88 T.C. 702, 737 (1987); Markell, at *22. The caselaw clearly says that tax avoidance is "no more a business purpose than actually engaging in tax avoidance." ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 n.6 (D.C. Cir. 2000), aff'g T.C. Memo. 1998-305; see also Boca Investerings P'ship v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003) ("The business purpose doctrine applied in ASA Investerings establishes that while taxpayers are allowed to structure their business transactions in such a way as to minimize their tax, these transactions must have a legitimate non-tax avoidance business purpose to be recognized as legitimate for tax purposes.") We must decide whether the "parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." ASA Investerings, 201 F.3d at 513.

Kalkhoven and Pettit argue that the client members contributed the option pairs to BCP to diversify their risk and that BCP must be respected if it provided an objective nontax benefit or it had a subjective business purpose. But the Commissioner retorts that any diversification here was merely pretext rather than a

**[*55]** real business purpose and that adding BCP into the mix only complicated everything. A relatively minor business purpose will not validate a transaction if it's no more than a facade. Id. at 513-16. And BCP hasn't demonstrated that diversification was anything more than a facade to hide BCP's true purpose-- generation of $3.3 billion in non-economic losses.[22]

*Paired Options*. The paired options in these cases consisted of short and long European digital options, similar to those we have seen in other iterations on this Son-of-BOSS transaction. See, e.g., Markell, T.C. Memo. 2014-86. Essentially all of the BCP options had substantial similarities: (1) the ratio of the cash payout if the paired options were in-the-money to the cash outlay was just over 2:1; (2) the short option payout was 99.7% of the long option payout; (3) the cash outlay was just under .5% of the long premium; (4) all had between a 26% and 27% chance of being in the money at maturity; (5) all options were between 3% and 5% away from the spot rates at the time of the trade; and (6) all options had maturity dates between October 19 and December 15, 2000.

---

[22] BCP contends that Bolton pooled the option pairs as part of CDS Plus to diversify their investors' assets. Kalkhoven and Pettit testified that they invested with Bolton as part of a broad diversification plan and that they saw CDS Plus as part of that plan. We find this testimony--to the extent it relates to the contribution of the option pairs to BCP--not credible and inconsistent with the objective facts before us.

**[\*56]**   The terms of the option spread were also unusual.  The strike prices were only one "pip" apart and very far out-of-the-money.  The strike prices were so close together that, from a risk-management perspective, they were indistinguishable.  Refco, as both the calculating and settlement agent, had the choice of any price that was printed at 10 a.m. on the date of expiration.  The key fact is that the short option could not have been disposed of without the long option:  We specifically find that Refco would never have allowed BCP, which had only $65 million in its Refco account, to collect $3.3 billion on the short leg or even dispose of it separately given the credit risk.  And here, the credit risk to Refco would be the inability to collect from BCP if the short leg was in-the-money at expiration.  Refco, in its own economic self-interest, would never choose a spot rate that fell in the "sweet spot."

*Profit motive*.  The Commissioner determined that BCP lacked a genuine profit motive when it purchased the Japanese yen and acquired the option pairs.  When E&Y promoted CDS Plus, it carefully explained the tax implications; but Kalkhoven and Pettit can't quite remember ever discussing whether CDS Plus

[*57] could actually make a profit outside of tax saving. They didn't independently look at whether CDS Plus could make nontax profits either.[23]

CDS Plus was a tax strategy E&Y promoted specifically to offset the capital gains from CDS--another strategy E&Y promoted to lower its wealthy clients' tax liabilities and known as the "Loss Generator." CDS was designed to use an ordinary loss to offset ordinary income and generate capital gains the next year. CDS Plus was supposed to get rid of the resulting capital gains. Everything about CDS Plus was strictly focused on tax savings. It was offered only to wealthy clients with at least $40 million to shelter. E&Y told clients to withdraw from BCP the year they wanted to generate losses. The high transaction fees were all based on the amount of the desired loss. Kalkhoven and Pettit's client members paid almost $19 million in fees to E&Y and Bolton Capital for CDS Plus. That's not including the premiums the client members had to pay Refco and the $75,000 for an opinion letter. Pettit even testified that he didn't care about these fees--he

---

[23] As we've said, Esrey and LeMay don't try to claim that BCP was anything other than a sham, so it's worth noting what they said about the transaction since they are in similar positions to Kalkhoven and Pettit. Esrey and LeMay stipulated that they participated in CDS Plus simply to lower their tax bills when they exercised their Sprint options and unwound their CDS transactions. They didn't care about the possibility of actual profit. Neither discussed the topic with E&Y or Six. Esrey said in court that CDS Plus was "bogus", and LeMay said it was fraudulent.

[*58] just wanted E&Y to take care of everything. Coplan admitted that any payout would be less than the transaction fees and Six and Bolton admitted CDS Plus couldn't make money. Coplan said that the E&Y slides explaining CDS Plus were strictly for internal use and he was concerned that CDS Plus would "lose all of its 'business purpose' if it is reduced to steps in a PowerPoint slide." The slides were not even supposed to be shown to clients. This all adds up to an obvious conclusion--the "business purpose" was tax savings, and that's not a real business purpose.

We also have to note that the facts here fall squarely within other cases disallowing deductions in Son-of-BOSS deals.

In 6611, Ltd., T.C. Memo. 2013-49, the taxpayers scored gigantic paydays in contingency fees. A promoter approached the taxpayers with an aggressive tax planning strategy involving digital options and Canadian dollars. The scheme began with the purchase of foreign-currency short and long options as well as Canadian dollars through a single-member LLC, the formation of a partnership with a third party, and the contribution of the options and the Canadian dollars to that partnership. The options would then expire worthless, creating huge tax losses at the partnership level that could be unlocked when the single-member LLC sold the Canadian dollars it received when the partnership liquidated. There,

**[\*59]** the Commissioner argued the LLCs were single-member LLCs and should be disregarded for tax purposes. The taxpayers countered that because theirs was a community-property state, their wives were the second owners of the LLCs, making the LLC a partnership by default under the regulations. See sec. 301.7701-3(a) and (b)(1)(i), Proced. & Admin. Regs. We disagreed with the taxpayers, because not a single Luna factor weighed in favor of finding a partnership entity and several weighed heavily against it.

In Historic Boardwalk, 694 F.3d at 455-60, the Third Circuit concluded that a partner who avoids any meaningful downside risk in the partnership, while enjoying a dearth of meaningful upside potential, was not a *bona fide* partner at all. Following the Second Circuit, the court held that to be a *bona fide* partner for tax purposes, a party must have a meaningful stake in the success or failure of the enterprise. Id. at 449. The Second Circuit itself had disregarded two foreign banks as possible partners because the prevailing character of their interest resembled debt rather than equity. TIFD, 459 F.3d at 231 (finding the purported interests were "overwhelmingly in the nature of a secured lender's interest, which would neither be harmed by poor performance of the partnership nor significantly enhanced by extraordinary profits").

**[*60]**  The Seventh Circuit in Superior Trading, LLC v. Commissioner, 728 F.3d

676 (7th Cir. 2013), aff'g 137 T.C. 70 (2011) and T.C. Memo. 2012-110,

disregarded a supposed partnership where it lacked a valid business purpose aside

from tax motivation.  In that case, the partners created an LLC and contributed to

it uncollectible accounts receivable from a defunct Brazilian company.  The

partners then sold their interests to outsiders who could take advantage of the

losses on the sales of the worthless receivables--all because of a since-closed

loophole in the Code.  See American Jobs Creation Act of 2004, Pub. L. No. 108-

357, sec. 833, 118 Stat. at 1589 (amending  sections 704(c) and 743).  The court

found that the sole purpose of creating the LLC was to transfer the losses of the

bankrupt Brazilian retailer to U.S. taxpayers who could then deduct the losses

from their taxable income.  The court also found that a *bona fide* partnership

requires a joint business goal by the partners.  Superior Trading, 728 F.3d at 680

(finding no joint business goal where one partner aimed to extract value from a

worthless asset, and the other aimed to make the loss from  that asset a "tax

bonanza").

We'll not step off this well-marked trail today.  We find that BCP was

created to carry out a tax-avoidance scheme, and we find that the client members

never intended to run a business through BCP.  We find that the client members

**[\*61]** had no intention to join BCP to share in profits and losses from business activities--they all left in just over a year.  We also find that CDS Plus was done through BCP only to further a tax-avoidance scheme.  And we find that the character of the resulting tax loss, and not any potential for profit, was the primary consideration in buying and then distributing the option pairs.[24]

We therefore will disregard BCP.

IV.    Consequences of Disregarding BCP

When we disregard a partnership for tax purposes, we are holding that the rules of subchapter K of chapter 1 of the Code (the substantive law governing the income taxation of partners) no longer apply, and that we will treat the partnership's activities as engaged in directly by the purported partners.  See 436, Ltd., T.C. Memo. 2015-28, at \*34-\*35.  A disregarded partnership has no identity separate from its owners, and we treat it as just an agent or nominee.  See, e.g., Tigers Eye, 138 T.C. at 94, 96 n.32, 99.  But disregarding the partnership doesn't necessarily mean that all the items reported by the disregarded partnership are reduced to zero--we still need to deal with the substance of the transactions to the extent we have jurisdiction.  See, e.g., ACM P'ship v. Commissioner, 157 F.3d

---

[24] We will grant the partners' Joint Motion to Substitute Exhibits 84-J, 86-J, and 92-J.  We will deny the partners' other motions as moot.

[*62] 231, 262-63 (3d Cir. 1998) (allowing deductions for securities that had

"objective economic consequences apart from tax benefits * * * even when

incurred in the context of a broader transaction that constitute[d] an economic

sham" (citations omitted)), aff'g in part, rev'g in part T.C. Memo. 1997-115;

Tigers Eye, 138 T.C. at 108-09 (holding we have jurisdiction under TEFRA to

determine the basis of property allegedly contributed to a purported partnership,

even if it never existed).

The Code tells us that TEFRA procedures will still apply in these cases as

long as the purported partnership filed a partnership return--which BCP did.  See

secs. 6231(g), 6233; see also sec. 301.6233-1(b), Proced. & Admin. Regs.  This

means that we have to determine any items that would have been "partnership

items," as defined in section 6231(a)(3), and section 301.6231(a)(3)-1, Proced. &

Admin. Regs., had BCP been a valid partnership for tax purposes.  Tigers Eye, 138

T.C. at 97.  This is the "hypothetical entity" approach.  See id. at 148-49 (Halpern,

J., concurring).

In these cases that means we treat everything as being owned directly by the

client members--and this includes the option pairs.  We also treat the option pairs

as never being contributed to BCP and any gain or loss supposedly realized by

BCP as having been realized by the client members.  The client members are not

**[\*63]** treated as partners, since there is no partnership.  With regard to the option contracts specifically, we incorporate our analysis in Markell and adopt its holding again here.  Markell, at \*35-\*36.

With regard to the option contracts, the client members should have treated the foreign-currency options as single-option spreads--meaning the long and short positions were part of one contract and couldn't have been separated as a matter of fact and law.  See id.; cf. sec. 1092 ("straddle" rules).  We sustain the Commissioner's disallowance of the losses the client members claimed so each of the client member's basis must be adjusted as follows:

| Client member | Basis adjustment |
| --- | --- |
| WTETP | $62,927,865 |
| KP1 | 90,577,799 |
| KP2 | 30,192,600 |
| PCMG VI | 170,892,509 |
| PCMG XII | 709,108,965 |

BCP did have basis in the yen.  That basis then passed on to the client members, who got small losses or gains.  Their appropriate bases in the yen are, like the option contracts, just what the client members paid for the yen.  See sec. 1012(a); see, e.g., Markell, at \*35-\*36.  BCP used the proceeds from the sales of the options to buy $2,296,252 in yen from Refco.  Since we have disregarded

[*64] BCP, we treat the client members as having bought and sold the yen directly and recognizing any gain or loss accordingly.  We will leave these computations for later, and

<u>Appropriate decisions will be entered</u>.